[No. D019805. Fourth Dist., Div. One. Feb. 24, 1994.]

EDA ARTIGLIO et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
McGHAN MEDICAL CORP. et al., Real Parties in Interest.

## COUNSEL

Robins, Kaplan, Miller & Ciresi, Joseph L. Dunn, Bruce A. Finzen, Gary L. Wilson, Anne Andrews, Wilson, Szumowski & Bolton, Daniel C. Bolton, Brown, Mangione, Fabbro, Zakaria & Scarlett, Steve Fabbro, Hersh & Hersh, LeRoy Hersh, Liccardo, Rossi, Sturges & McNeil, Salvador Liccardo, Lopez & Hodes, Ramon Lopez, Ropers, Majeski, Kohn & Bentley, Charles M. Louderback, Robinson & Phillips, Mark P. Robinson, Sherman, Dan & Portugal, Arthur Sherman, Simke, Chodos, Silberfeld & Anteau and Roman Silberfeld for Petitioners.

No appearance for Respondent.

Haight, Brown & Bonesteel, Thomas M. Moore, Amor Esteban, Jeffrey B. Margulies, Gordon & Rees, Jack B. McCowan, Jr., Morris, Polich & Purdy, Anthony G. Brazil, Sedgwick, Detert, Moran & Arnold, Michael F. Healy, Dickson, Carlson & Campillo, Mario Horwitz, McInnis, Fitzgerald, Rees, Sharkey & McIntyre, Cary W. Miller, Landels, Ripley & Diamond, James A Bruen, Derrick K. Watson, Deborah K. Miller, Lynch, Loofbourrow, Helmenstine, Gilardi & Grummer, Robert S. Niemann, Mazzarella, Dunwoddy, Wilson & Petty, Regina Petty, Palmieri, Tyler, Wiener & Wilhelm and Frank C. Rothrock for Real Parties in Interest.

## OPINION

**FROEHLICH, J.**—This petition seeks reversal of an order of summary adjudication made by the judge in charge of coordinated cases, given the coordination title of "Breast Implant Cases." The court ruled that the plaintiffs could not state a cause of action for strict liability based on design defect. This ruling is challenged on a number of grounds as discussed hereafter. Writ review of the order is authorized by Code of Civil Procedure section 437c, subdivision (*l*).

The great number of claims administered in common in this coordinated proceeding were originally based upon individually filed complaints. The coordination process has resulted in an amalgamated standard complaint representative of all interests called the "Master Complaint." The Master Complaint alleges liability on the part of the defendants on a number of bases, including such theories as negligence, breach of warranty, medical malpractice, etc. The only cause of action which is the subject of this order of summary adjudication is the cause of action for strict liability.[1] The trial court granted the motion for summary adjudication, ruling that "implanted medical devices, such as the mammary prostheses involved in these coordinated cases, are exempt from strict 'design defect' liability as a matter of law. . . ."

■ The concept of strict liability imposes legal responsibility for injury upon the manufacturer of a product without proof of negligence based upon a determination that the product is: (1) defectively manufactured, (2) defectively designed, or (3) distributed without adequate warnings as to its potential for harm.[2] *Brown* v. *Superior Court, supra,* 44 Cal.3d 1049, established an exception to general products strict liability rules for prescription drugs. It was held, for policy reasons set forth at length in the opinion, that

---

[1]The complaint's count for "strict liability" identifies as grounds therefor that the product was "defective and unreasonably dangerous in design and manufacture," and that there were inadequate warnings concerning the risks of use of the product. In trial court proceedings an issue was raised as to whether the product design defect allegation could be severed for purposes of summary adjudication from the defective manufacture and the failure to warn allegations, thus treating it as a separate cause of action (the three claims having been pled as one). The trial court ruled that although pled as a single cause of action the allegations of the count embraced three distinct and separate theories of liability, and hence could be addressed individually notwithstanding the combined pleading, and that such ruling did not violate the purpose and intent of Code of Civil Procedure section 437c, subdivision (f) (which provides that "[a] motion for summary adjudication shall be granted only if it completely disposes of a cause of action. . . ."). This part of the court's ruling is not challenged· by the writ petition,and hence we accept it as correct.

[2]A great deal has been written about "strict liability" and its evolution in California. Rather than repeat or even attempt summary of this material, we simply reference *Brown* v. *Superior Court* (1988) 44 Cal.3d 1049 [245 Cal.Rptr. 412, 751 P.2d 470]; *Barker* v. *Lull Engineering*

drug manufacturers could not be held strictly liable for design defects in prescription drugs. (*Id.* at p. 1069.) The trial court held that the rationale of *Brown* was applicable to breast implant devices. We agree with the trial court and hence deny the writ petition. The explanation for our agreement is best revealed by analysis and rejection of the petitioners' several objections to the ruling.

■ Petitioners first contend that a condition to avoidance of strict liability is that the product has been marketed with adequate warnings of its potential risks. It is true that pre-*Brown* authorities lumped together the concepts of proper manufacture, lack of design defect and adequate warning.[3] *Brown*, however, very clearly distinguished among the three concepts of fault. Liability for defective design could not be premised on strict liability, but would require proof of negligence. (*Brown* v. *Superior Court, supra,* 44 Cal.3d at p. 1061.) Strict liability would continue applicable for manufacturing defects; and liability for failure to warn of known or reasonably knowable risks in the use of the product remains viable "under general principles of negligence." (*Id.* at p. 1069, fn 12.) Therefore, in reaching the question of strict liability based solely on design defect the court was not required to, and it did not, consider or rule upon either manufacturing fault or failure to give adequate warnings. The summary adjudication leaves these issues unresolved and available for future adjudication.

■ A second contention of the petitioners is that exemption from exposure to strict liability for design defects is available only for drug products

---

Co. (1978) 20 Cal.3d 413 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1]; and *Hufft* v. *Horowitz* (1992) 4 Cal.App.4th 8 [5 Cal.Rptr.2d 377].

[3]The progenitor of this language was comment k to Restatement Second of Torts section 402A (comment k), which referred to products deserving of market exposure exempt from strict liability potential even though they involved an unavoidably high degree of risk, stating that "[s]uch a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous." Subsequent cases similarly joined the concepts of product manufacture, product design and adequate warning so as to suggest imposition of strict liability upon a determination of failure of performance of any of the three tests. (See, e.g., *Toole* v. *Richardson-Merrell, Inc.* (1967) 251 Cal.App.2d 689, 709 [60 Cal.Rptr. 398, 29 A.L.R.3d 988]; *Grinnell* v. *Charles Pfizer & Co.* (1969) 274 Cal.App.2d 424, 435, fn. 7 [79 Cal.Rptr. 369].) Even the *Brown* case, in its "conclusion" of discussion, lumped the three potential bases of strict liability together, saying that "we hold that a manufacturer is not strictly liable for injuries caused by a prescription drug so long as the drug was properly prepared and accompanied by warnings of its dangerous propensities that were either known or reasonably scientifically knowable at the time of distribution." (*Brown* v. *Superior Court, supra,* 44 Cal.3d at p. 1069.) Of course, it is accurate to state that complete avoidance of liability depends upon absence of all of the three potential bases for same. This rather obvious conclusion, affirmed by the first paragraph of the *Brown* court's footnote 12 on page 1069, supports rather than detracts from *Brown*'s identification of design defect strict liability as a factor to be dealt with separate from the questions of either manufacturing defect or warning failure.

which have been tested and approved by the United States Food and Drug Administration (hereafter FDA). Petitioners assert that breast implants not only have not been so tested and approved, but in fact in recent years have been disapproved by the FDA. Petitioners base their argument upon a portion of footnote 12 on page 1069 of *Brown v. Superior Court, supra,* 44 Cal.3d, which states: "It should also be noted that the consumers of prescription drugs are afforded greater protection against defects than consumers of other products, since 'the drug industry is closely regulated by the Food and Drug Administration, which actively controls the testing and manufacture of drugs and the method by which they are marketed, including the contents of warning labels.'" (Quoting from *Sindell v. Abbott Laboratories* (1980) 26 Cal.3d 588, 609 [163 Cal.Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061].) The weakness of petitioners' position is that nowhere in the *Brown* opinion proper is there any suggestion that FDA testing or approval is a requisite to exemption from design defect strict liability. The footnote reference is little more than a makeweight afterthought to the opinion's policy argument. Further, in its footnote the *Brown* court did not state that FDA "approval" was a condition to exemption, but merely that the drug industry in general is closely regulated. Through appellate briefing we have been educated as to the various levels of FDA testing, regulation and approval, and the years at which such came into effect. This dissection and examination of the federal regulation of the drug industry was in the main not available to the trial court, however, and the court's order granting summary adjudication does not refer to this aspect of petitioners' argument. Also, there is no suggestion in *Brown* or any other California authority that FDA approval or regulation is relevant to the determination of prescription drug exemption from design defect strict liability. On the contrary, the *Brown* court consistently speaks simply of "drug manufacturers," "drugs," and occasionally of "prescription drugs." We note, also, that comment k to the cited Restatement provision, which is the genesis of the special treatment of prescription drugs, pertains broadly to products for which FDA review and approval could not have occurred at the time of initial distribution, as it covers "many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients . . . ." We therefore conclude that there is no authority for the proposition that FDA control or approval of a product has anything to do with its exemption from design defect products strict liability.

■ Conceivably the most potentially persuasive of petitioners' arguments is that based on the definitional holding of *Brown. Brown* establishes a rule for prescription drugs; this rule does not control the issue of strict

liability for breast implants, it is contended, because the breast implant is a medical device and not a "drug." Related to this argument is the corollary contention that the exemption from strict liability should be available only for worthy prescriptions which save lives or promote health, and should be denied for medical applications which are merely cosmetic.

We are able to deal with these contentions summarily, since they have been completely addressed in *Hufft v. Horowitz, supra,* 4 Cal.App.4th 8.[4] That case, from a sister division of our Fourth District, dealt with the potential of strict liability for design defects in penile prostheses. After ample exploration of the subject, the *Hufft* court concluded that ". . . the rule of *Brown* . . . immunizing manufacturers of prescription drugs from strict liability for design defects, should be extended to manufacturers of implanted prescription medical devices." (*Id.* at p. 11.) While there are obvious differences in the devices, we apprehend that the reasoning leading the *Hufft* court to exempt penile prostheses from strict liability applies equally to breast implants. Just as drugs are injected or ingested into the body, a breast implant, as a penile prosthesis, is "plugged in" to the individual. The implant, in each case, poses the potential of harm and the possibility of required removal. (*Id.* at p. 18.) Just as with typical prescription drugs, the public interest is served by the development of effective and affordable medical implants, such as each of these devices illustrates.

We also reject, as did the *Hufft* court, the contention that the aspect of cosmetic improvement somehow eliminates breast implants from exemption from strict liability. The *Hufft* court summarily stated in a footnote that "[i]t is irrelevant to our analysis whether a patient has obtained a penile prosthesis for procreation, alleviation of an impotency problem or cosmetic purposes." (4 Cal.App.4th at p. 18, fn. 9.) We agree, and would add that in these days of recovery of vast amounts for mental suffering and emotional distress, it seems sophistic indeed to suggest that medical devices which enhance esteem and add to life's enjoyment are somehow not as protectible as those which merely increase health or combat disease. In any event, it is clear that some substantial percentage of breast implants are for the purpose of restoring the body to natural form following cancer surgery, which presumably anyone would agree is a "medical" rather than "cosmetic" purpose. Any effort to distinguish the potential for strict liability as respects identical medical procedures, based upon the motivation for such (cosmetic in the one case as distinguished from medical reconstruction in another) would not only be fraught with extremely nice and practically difficult

---

[4]*Hufft* was followed by *Plenger* v. *Alza Corp.* (1992) 11 Cal.App.4th 349 [13 Cal.Rptr.2d 811], which applied parallel reasoning and conclusions to the potential of strict liability for the manufacture and distribution of an intrauterine device.

factual determinations, but also would be contrary to the approach dictated by *Brown*, which is to reject a case-by-case analysis in favor of protection for an entire category of procedures.

■ The last issue deserving discussion relates to the procedure by which the trial court's order was reached. The motion resulting in the order was for summary adjudication, and under well-established rules the granting of it depends upon a determination that no triable issue of fact exists as to the cause of action in question. Our review of the granting of a motion for summary adjudication is independent, requiring us to examine the moving and responding papers, using the same analysis as the trial court. (*Jackson* v. *Ryder Truck Rental, Inc.* (1993) 16 Cal.App.4th 1830, 1836 [20 Cal.Rptr.2d 913].)

A foundational question is: Just what did the defendants in this case have to establish to warrant summary relief? In *Kearl* v. *Lederle Laboratories* (1985) 172 Cal.App.3d 812, 829-830 [218 Cal.Rptr. 453], it was held that a drug could be found exempt from strict liability design defect only after a determination of mixed law and fact issues, to be made on evidence in a court trial. A judge would be required to determine: (1) whether the product was importantly beneficial, (2) whether the risk of its use was substantial and unavoidable, and (3) whether the benefits of its distribution outweighed the interests which would be promoted by permitting assertion of strict liability for design defects. If such procedure is required it is difficult to see how summary adjudication of the issue could ever be rendered.

The *Brown* court specifically rejected this case-by-case approach to a risk/benefit analysis. The *Kearl* procedure was found to provide no assurance to drug manufacturers that they would be protected from strict liability, thus undermining the objective of fostering research and production of new drugs. (*Brown* v. *Superior Court, supra*, 44 Cal.3d at pp. 1067-1068.) Also, the *Brown* court noted that the *Kearl* approach would permit inconsistency of determinations as to eligibility of a drug for immunity from strict liability -- not only inconsistency among courts but possible inconsistency in the same case in rulings by the judge and jury on parallel issues. (*Id.* at p. 1068.)

The conclusion of the *Brown* court, therefore, was that the mini-trial procedure suggested by *Kearl* was erroneous, and instead that uniformity in providing immunity from strict liability for design defects should be achieved by affording it to all "prescription drugs." (44 Cal.3d at p. 1069.) In footnote 11 the court noted possible ambiguity as to this issue in the Restatement comment k, and stated ". . . we are of the view that the comment was intended to and should apply to all prescription drugs." (*Brown* v. *Superior Court, supra*, 44 Cal.3d at p. 1069.)

In order to find that breast implants, as a category, should be afforded the same protection from strict liability design defect exposure as prescription

drugs, we are required to conclude that implants, including we would presume, all medically implanted prostheses, benefit from the same protective strictures as do prescription drugs. It is curious that nowhere in the legal authorities which guide us is there a definition of "prescription drug." Apparently there is no need for precision in this regard because all of the drugs considered in *Brown* and following cases were stipulated, or assumed to be, available only by "prescription." The conclusion is that the imposition of the condition of "prescription" provides insulation between the manufacturer and the user such as to warrant elimination of the consumer protections afforded by strict liability. We find the same to be true of medical prostheses, at least as to those in the category of devices available only through the services of a physician. Since the device is provided directly by the physician, it is not strictly speaking within the category of a "prescribed" product. As remarked by the *Hufft* court, however, the considerations leading to protection of prescription drugs "apply with equal force to implanted medical devices [since they are] available only through a physician . . . ." (*Hufft* v. *Horowitz*, *supra*, 4 Cal.App.4th at p. 18.)

We therefore follow the lead of the *Hufft* and *Plenger* courts, and conclude that the entire category of medical implants available only by resort to the services of a physician are immune from design defect strict liability. There is no contention anywhere in the record of these coordinated cases that any of the breast implants, the subject of the various claims, were obtained other than by the services of a physician. Therefore, the determination that strict liability based on design defect is unavailable for all such claims is one to be made as a matter of law, and without the benefit of any factfinding, except for the sole factual determination, made without dispute in these cases, that the breast implants are all physician-directed and physician-applied. Summary adjudication was therefore appropriate.

The petition for writ of mandate is denied.

Todd, Acting P. J., and Benke, J., concurred.