[No. B234368. Second Dist., Div. Three. Mar. 6, 2013.]

TODD GARRETT, Plaintiff and Appellant, v.
HOWMEDICA OSTEONICS CORPORATION et al., Defendants and
Respondents.

174

**COUNSEL**

Law Offices of Martin N. Buchanan, Martin N. Buchanan; Girardi | Keese, Thomas V. Girardi and Amanda H. Kent for Plaintiff and Appellant.

Sedgwick, Ralph A. Campillo, Steven D. Di Saia and Hall R. Marston for Defendants and Respondents.

## Opinion

**CROSKEY, J.**—Todd Garrett appeals a summary judgment in favor of Howmedica Osteonics Corporation (Howmedica) and Stryker Corporation (Stryker) in a products liability action involving an implanted prosthetic device.[1] He contends defendants failed to satisfy their burden to show that the prosthesis was not defective, the exclusion of portions of his expert's declaration was error and his expert's declaration creates triable issues of fact precluding summary judgment.

We hold that (1) the doctrine of strict products liability based on a design defect is inapplicable to implanted medical devices available only through the services of a physician and cannot provide a basis for the defendants' liability, and (2) the exclusion of portions of plaintiff's expert's declaration was error. In so holding, we reject defendants' argument that the exclusion of evidence was proper under the principles recently articulated by the California Supreme Court in *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 [149 Cal.Rptr.3d 614, 288 P.3d 1237] (*Sargon*). We conclude further that the expert's declaration creates triable issues of fact precluding summary adjudication of two counts alleged in the complaint. We therefore will reverse the judgment with directions.

### FACTUAL AND PROCEDURAL BACKGROUND

#### 1. Factual Background

Garrett was treated for cancer in his left femur (thigh bone). Jeffrey Eckardt, an orthopedic surgeon, ordered a prosthetic device to replace the middle portion of the femur. Howmedica and Stryker allegedly participated in some manner in the design or manufacture of the prosthesis. Eckardt implanted the prosthesis in August 2007, attaching it to the two remaining ends of the femur using an adhesive and cross-pins.

Garrett reported pain in his thigh beginning in February 2009. Eckardt investigated and detected a fatigue fracture in the prosthesis. Eckardt replaced the fractured prosthesis with a different type of prosthesis in March 2009. The new prosthesis included an artificial joint, and the second surgery required a considerably longer recovery time than the first.

#### 2. Trial Court Proceedings

Garrett filed a complaint in August 2009 and filed a third amended complaint against Howmedica, Stryker and others in September 2010. He

---

[1] Defendants acknowledge that this action is not preempted by the federal Medical Device Amendments of 1976 (21 U.S.C. § 360c et seq.).

alleges counts against Howmedica and Stryker for (1) strict products liability based on manufacturing and design defects; (2) strict products liability based on failure to warn; (3) breach of express warranty; and (4) negligence.[2]

Howmedica and Stryker filed a motion for summary judgment or summary adjudication in March 2011. They argued that Garrett's discovery responses showed that he had no evidence to establish the essential elements of his claims. They also argued that the evidence presented in support of their motion showed that the prosthesis was not defective and that they had no duty to warn as a matter of law. They filed a declaration by Albert H. Burstein, a mechanical engineer, stating his opinion that the prosthesis was not defective in design or manufacture, that the fracture was caused by a cyclical rotational force resulting from normal human activity and that the force simply exceeded the load that the product could bear over time. They also presented Garrett's discovery responses and other evidence in support of the motion.

Garrett opposed the motion, except that he did not oppose the attack on his count for strict products liability based on failure to warn. Garrett filed a declaration by Lawrence Kashar, a metallurgist, stating that he had determined through destructive testing and other examinations that the portion of the prosthesis that suffered a fracture "was softer tha[n] the minimum required hardness in two of the three ASTM specifications that cover Cobalt-28% Chromium-6% Molybdenum alloy for use as an implant material, and was less than the expected hardness of the third specification." Kashar stated that (1) hardness was a direct indication of the strength of the material; (2) a portion of the prosthesis was not made from the cobalt-chromium-molybdenum alloy, but instead was made from a titanium alloy; and (3) he had detected "a layer of polymeric-like material" in holes surrounding the cross-pins and noted that defendants' deponent had "stated that no polymeric material should be involved with this implant." Kashar characterized these as "anomalies" and stated his opinion that, based on these purported anomalies, the prosthesis was defective in manufacture and/or design and that there were "strong arguments" that the purported defect had caused the prosthesis to fail.

Howmedica and Stryker filed evidentiary objections to most of the substantive portions of the Kashar declaration on various grounds, including lack of expert qualification, lack of an explanation or reasoning to support an expert opinion, "lacks foundation" (capitalization omitted) and relevance.

---

[2] Garrett also alleged a count against Howmedica and Stryker for fraudulent concealment, but he later dismissed that count.

The trial court concluded that Garrett's discovery responses showed that he had no evidence that the prosthesis was defective or that defendants had breached an express warranty or were negligent. The court stated that Garrett was relying on the mere fact that the product had failed, which was insufficient evidence to establish a basis for liability, and that after litigating this case for almost two years, he could not reasonably expect to obtain evidence of a product defect, breach of warranty, negligence or causation. The court stated further that the Burstein declaration filed by defendants also supported the conclusion that Garrett could not establish either the existence of a product defect or causation.

The trial court also found that the Kashar declaration failed to satisfy the requirements for admissibility of expert opinion because it lacked a reasoned analysis and an adequate foundation for his opinions.[3] The court sustained objections to all of the challenged portions of the Kashar declaration, with only one exception. The court concluded that Garrett had failed to create a triable issue of material fact and that defendants were entitled to summary judgment as a matter of law. The court entered a judgment in favor of Howmedica and Stryker in June 2011. Garrett filed a timely appeal.

## CONTENTIONS

Garrett contends (1) the evidence that the prosthesis failed less than two years after the surgery creates a triable issue of fact as to the existence of a design defect and causation, and defendants failed to satisfy their burden of presenting evidence that the prosthesis was not defective under the risk-benefit test; (2) a triable issue of fact exists as to the existence of a design defect under the consumer expectations test; (3) Kashar adequately stated the basis for his opinion, and the exclusion of portions of his declaration was error; and (4) the Kashar declaration creates triable issues of fact as to the existence of a design or manufacturing defect, negligence and causation.[4]

## DISCUSSION

### 1. Standard of Review

A court may grant a summary judgment only if there is no triable issue of material fact and the moving party is entitled to judgment in its favor as a

---

[3] The minute order ruling on defendants' motion for summary judgment or summary adjudication stated this reason for sustaining the objections to the Kashar declaration and later stated more generally as to each objection "Sustained."

[4] Garrett does not challenge the granting of summary judgment as to the counts for failure to warn strict products liability and breach of express warranty. He therefore abandons any claim of error with respect to those counts. (*Angelotti v. The Walt Disney Co.* (2011) 192 Cal.App.4th 1394, 1402, fn. 3 [121 Cal.Rptr.3d 863].)

matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary judgment must show that one or more elements of the plaintiff's cause of action cannot be established or that there is a complete defense. (*Id.*, subd. (p)(2).) The defendant can satisfy its burden by presenting evidence that negates an element of the cause of action or evidence that the plaintiff does not possess and cannot reasonably expect to obtain evidence needed to establish an essential element. (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460 [30 Cal.Rptr.3d 797, 115 P.3d 77] (*Miller*).) If the defendant meets this burden, the burden shifts to the plaintiff to present evidence creating a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2).)

We review the trial court's ruling on a summary judgment motion de novo, liberally construe the evidence in favor of the party opposing the motion, and resolve all doubts concerning the evidence in favor of the opponent. (*Miller, supra*, 36 Cal.4th at p. 460.) A different standard of review applies to the court's evidentiary rulings in connection with the motion, which we review for abuse of discretion. (*Miranda v. Bomel Construction Co., Inc.* (2010) 187 Cal.App.4th 1326, 1335 [115 Cal.Rptr.3d 538].)

We must affirm a summary judgment if it is correct on any of the grounds asserted in the trial court, regardless of the trial court's stated reasons. (*Conte v. Wyeth, Inc.* (2008) 168 Cal.App.4th 89, 113 [85 Cal.Rptr.3d 299].) Even if the grounds entitling the moving party to a summary judgment were not asserted in the trial court, we must affirm if the parties have had an adequate opportunity to address those grounds on appeal. (*Johnson v. United Cerebral Palsy/Spastic Children's Foundation* (2009) 173 Cal.App.4th 740, 754 [93 Cal.Rptr.3d 198]; *Western Mutual Ins. Co. v. Yamamoto* (1994) 29 Cal.App.4th 1474, 1481 [35 Cal.Rptr.2d 698]; see Gov. Code, § 68081; Code Civ. Proc., § 437c, subd. (m)(2).)

2. *Design Defect Strict Products Liability Is Inapplicable to Implanted Medical Devices*[5]

■ The doctrine of strict products liability imposes strict liability in tort on the manufacturer of a defective product and others in the product's chain

---

[5] Howmedica and Stryker argue for the first time in their respondents' brief that design defect strict products liability is inapplicable to implanted medical devices. We will address this argument despite defendants' failure to raise the issue in the trial court because it is potentially dispositive of part of the appeal and involves a purely legal question. (*Fort Bragg Unified School Dist. v. Colonial American Casualty & Surety Co.* (2011) 194 Cal.App.4th 891, 907 [124 Cal.Rptr.3d 144].)

of distribution. (*Jimenez v. Superior Court* (2002) 29 Cal.4th 473, 477–478 [127 Cal.Rptr.2d 614, 58 P.3d 450]; *Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 63 [27 Cal.Rptr. 697, 377 P.2d 897].) The purpose of the imposition of liability is to ensure that the loss is borne not by injured consumers but by manufacturers, retailers and others in the chain of distribution who are better able to reduce the risks of injury and can equitably distribute the loss to the consuming public. (*Jimenez, supra,* at pp. 477–478; *Vandermark v. Ford Motor Co.* (1964) 61 Cal.2d 256, 262–263 [37 Cal.Rptr. 896, 391 P.2d 168].)

■ Strict products liability has been imposed for defects arising from flaws in the manufacturing process (manufacturing defects), defects in the design rendering a product unsafe (design defects) and inadequate warnings or failure to warn (warning defects). (*O'Neil v. Crane Co.* (2012) 53 Cal.4th 335, 347 [135 Cal.Rptr.3d 288, 266 P.3d 987]; *Brown v. Superior Court* (1988) 44 Cal.3d 1049, 1057 [245 Cal.Rptr. 412, 751 P.2d 470] (*Brown*).) A product is defective in design if the benefits of the design do not outweigh the risk of danger inherent in the design (risk-benefit test), or if the product fails to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner (consumer expectations test). (*Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 418 [143 Cal.Rptr. 225, 573 P.2d 443].)

■ The California Supreme Court in *Brown, supra,* 44 Cal.3d 1049, held that a manufacturer of prescription drugs cannot be strictly liable for a design defect and that the appropriate test for determining a prescription drug manufacturer's liability for a design defect involves an application of the ordinary negligence standard. (*Id.* at pp. 1061, 1069.) Under the negligence standard as reflected in comment k to section 402A on page 353 of the Restatement Second of Torts, adopted in *Brown,* a manufacturer is liable for a design defect only if it failed to warn of a defect that it either knew or should have known existed. (*Brown, supra,* at p. 1059.)

*Brown* explained that the consumer expectations test is inappropriate for prescription drugs because an ordinary consumer would have no safety expectations with respect to a prescription drug apart from the information provided by his or her physician. (*Brown, supra,* 44 Cal.3d at pp. 1061–1062.) A prescription drug manufacturer that has provided appropriate warnings to the physician cannot be liable for the physician's failure to convey those warnings to the patient, and cannot be liable if the patient relies on information provided by others as to the side effects of the drug. (*Id.* at p. 1062.)

■ *Brown* also noted that the risk-benefit test is inappropriate for prescription drugs for public policy reasons. (*Brown, supra,* 44 Cal.3d at

pp. 1062–1065.) Unlike other products for which strict liability has been imposed, prescription drugs "may be necessary to alleviate pain and suffering or to sustain life." (*Id.* at p. 1063.) But, "unlike other important medical products (wheelchairs, for example), harm to some users from prescription drugs is unavoidable. Because of these distinctions, the broader public interest in the availability of drugs at an affordable price must be considered in deciding the appropriate standard of liability for injuries resulting from their use." (*Ibid.*) In many cases, to withhold a drug from the market in order to enhance its safety would not serve the public welfare, and public policy favors the development of new drugs despite the presence of some risks, even serious risks, "because drugs can save lives and reduce pain and suffering." (*Ibid.*) The potential for strict liability could cause drug manufacturers to refrain from researching and developing beneficial drugs for fear of liability, and the cost of insurance to protect against strict liability could increase the cost of medication beyond the reach of those who need it most. (*Ibid.*) *Brown* therefore concluded that application of the risk-benefit test would be against the public interest. (*Id.* at p. 1065.)

■ *Brown* rejected a case-by-case approach to determining whether a particular drug was exceptionally beneficial and "unavoidably dangerous," and therefore exempt from strict liability, concluding instead that prescription drugs as a class are *exempt* from strict liability for design defects regardless of whether the particular drug at issue is found to be "beneficial to the public health." (*Brown, supra,* 44 Cal.3d at p. 1065, fn. 10 & pp. 1066–1069.) ■ Drug manufacturers, however, are *not* exempt from liability for manufacturing defects, failure to warn or negligence. (*Id.* at p. 1069, fn. 12.)

■ *Hufft v. Horowitz* (1992) 4 Cal.App.4th 8 [5 Cal.Rptr.2d 377] (*Hufft*) held that the rule from *Brown, supra,* 44 Cal.3d 1049, also applies to "implanted prescription medical devices."[6] (*Hufft, supra,* at p. 11.) *Hufft* stated that, like prescription drugs, implanted medical devices are available only through the services of a physician and can alleviate pain and suffering, sustain life or provide other important benefits. (*Id.* at p. 18.) As is true of prescription drugs, harm to some users from implanted medical devices is unavoidable. (*Id.* at pp. 18–19.) *Hufft* stated, however, that unlike prescription drugs, an ordinary consumer might have a reasonable expectation as to the performance of an implanted medical device apart from the information provided by his or her physician. (*Id.* at pp. 17–18 & fn. 8.) Notwithstanding this, *Hufft* concluded that the public interest in the development, availability and affordability of implanted medical devices justifies an exemption from

---

[6] *Hufft, supra,* 4 Cal.App.4th 8, apparently used the terms "implanted prescription medical devices" (*id.* at p. 11), "implanted prescription medical product[s]" (*id.* at pp. 11, 19–20) and "implanted medical devices" (*id.* at pp. 17–19; see *id.* at p. 11) interchangeably, and assumed that all implanted medical devices "require a physician's prescription" (*id.* at p. 19, fn. 10).

design defect strict products liability for all implanted medical devices. (*Id.* at p. 19.) As in *Brown*, the *Hufft* court held that the exemption applies to all implanted medical devices, including the penile prosthesis involved in *Hufft*, and that a court need not determine whether the particular device at issue is unavoidably dangerous or exceptionally beneficial. (*Hufft, supra,* at p. 19.)

*Plenger v. Alza Corp.* (1992) 11 Cal.App.4th 349 [13 Cal.Rptr.2d 811] followed *Hufft, supra,* 4 Cal.App.4th 8, concluding that the public policy considerations articulated in *Brown, supra,* 44 Cal.3d 1049, are equally applicable to "prescription implanted medical devices." (*Plenger, supra,* at p. 360.) *Plenger* held that design defect strict products liability is inapplicable to an intrauterine device (IUD). (*Id.* at pp. 360–361.)

*Artiglio v. Superior Court* (1994) 22 Cal.App.4th 1388 [27 Cal.Rptr.2d 589] (*Artiglio*) also followed *Hufft, supra,* 4 Cal.App.4th 8, concluding that design defect strict products liability is inapplicable to implanted medical devices that are available only through the services of a physician. (*Artiglio, supra,* at p. 1397.) As in *Brown, supra,* 44 Cal.3d 1049, and *Hufft, supra,* 4 Cal.App.4th 8, *Artiglio* concluded that the exemption is categorical and is not determined on a case-by-case basis. (*Artiglio, supra,* at pp. 1395–1397.) *Artiglio* noted that the devices there at issue, breast implants, were provided directly by the physician and therefore were not, strictly speaking, "prescribed." (*Id.* at p. 1397.)

■ In this case, Garrett argues that the exemption from design defect strict products liability established in *Hufft, supra,* 4 Cal.App.4th 8, and its progeny, is limited to implanted medical devices that are available only by prescription. He argues that whether the prosthesis here was available only by prescription was not at issue in the trial court and the evidence in the record is inconclusive on this point, so summary judgment cannot be affirmed on this basis. We hold, however, that the exemption is not so limited. It is undisputed that the prosthesis here was both ordered by a physician and surgically implanted by a physician, and it cannot reasonably be disputed that the implant was available only through the services of a physician. As the court·concluded in *Artiglio, supra,* 22 Cal.App.4th 1388, the reasoning of *Brown, supra,* 44 Cal.3d 1049, and *Hufft, supra,* 4 Cal.App.4th 8, applies to an implanted medical device in these circumstances regardless of whether, strictly speaking, it was available only by prescription and regardless of whether it is properly characterized as a "prescription" implanted medical device. The public interest in the development, availability and affordability of implanted medical devices justifies an exemption from design defect strict products liability for all implanted medical devices that are available only through the services of a physician. (*Artiglio, supra,* 22 Cal.App.4th at p. 1397; see *Hufft, supra,* 4 Cal.App.4th at p. 18.)

We therefore conclude that Howmedica and Stryker cannot be strictly liable for a design defect under either the risk-benefit or consumer expectations test and that Garrett has shown no prejudicial error in the granting of summary judgment with respect to his claim for strict products liability based on a design defect.[7] That, however, does not dispose of Garrett's entire case.

### 3. *The Kashar Declaration Creates Triable Issues of Fact as to the Existence of a Manufacturing Defect and Negligence*

#### a. *The Exclusion of Portions of the Kashar Declaration Based on Evidence Code Sections 801 and 802 Was Error*

The trial court stated that the Kashar declaration "lacks adequate factual foundation" and "is entirely devoid of any reasoned analysis to support his opinion." Regarding Kashar's statement that the prosthesis was softer than the "minimum required hardness" in two of the three ASTM specifications covering "Cobalt-28% Chromium-6% Molybdenum" alloy for use in an implant and was less than the "expected hardness" of the third specification, the court stated that Kashar failed to "describe the testing process he used to arrive at this conclusion or describe the results of the testing." The court also stated that Kashar failed to describe what the ASTM specifications were and failed to state that the prosthesis should have complied with the ASTM specifications for that particular alloy. The court stated that therefore there was no basis for Kashar's opinion that the prosthesis was defective. The court also stated that Kashar offered no opinion that the purported defect caused any injury.

Evidence Code section 801 states: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

---

[7] Garrett alleges design defect strict products liability and manufacturing defect strict products liability together in a single count. However, because these are two separate theories of liability that properly could have been alleged as separate counts, we will treat them as such and conclude that summary adjudication is proper as to the count for design defect strict products liability. (*Mathieu v. Norrell Corp.* (2004) 115 Cal.App.4th 1174, 1188 [10 Cal.Rptr.3d 52]; *Lilienthal & Fowler v. Superior Court* (1993) 12 Cal.App.4th 1848, 1854–1855 [16 Cal.Rptr.2d 458].)

■ " 'An expert opinion has no value if its basis is unsound. [Citations.] Matter that provides a reasonable basis for one opinion does not necessarily provide a reasonable basis for another opinion. Evidence Code section 801, subdivision (b), states that a court must determine whether the matter that the expert relies on is of a type that an expert reasonably can rely on "in forming an opinion *upon the subject to which his testimony relates.*" (Italics added.) We construe this to mean that the matter relied on must provide a reasonable basis for the particular opinion offered, and that an expert opinion based on speculation or conjecture is inadmissible.' " (*Sargon, supra,* 55 Cal.4th at p. 770, quoting *Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558, 564 [10 Cal.Rptr.3d 34].)

■ The California Supreme Court in *Sargon, supra,* 55 Cal.4th 747, further explained that the trial court's gatekeeping responsibility with respect to expert testimony is governed not only by Evidence Code section 801, subdivision (b), but also by Evidence Code section 802. (*Sargon, supra,* at p. 771.) Section 802 states: "A witness testifying in the form of an opinion may state . . . the reasons for his opinion and the matter . . . upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion. The court in its discretion may require that a witness before testifying in the form of an opinion be first examined concerning the matter upon which his opinion is based."

Evidence Code section 802 allows the trial court to inquire into the reasons for an expert's opinion and to exclude expert opinion testimony if it is "based on reasons unsupported by the material on which the expert relies." (*Sargon, supra,* 55 Cal.4th at p. 771.) Evidence Code section 802 also allows the courts to develop " 'case law restrictions on an expert's "reasons." ' " (*Sargon, supra,* at p. 771.)

■ After discussing the trial court's gatekeeping responsibility under Evidence Code sections 801 and 802, *Sargon* also stated that "courts must also be cautious in excluding expert testimony. The trial court's gatekeeping role does not involve choosing between competing expert opinions. The high court warned that the gatekeeper's focus 'must be solely on principles and methodology, not on the conclusions that they generate.' (*Daubert v. Merrell Dow Pharmaceuticals, Inc.*[ (1993)] 509 U.S. [579, ]595 [125 L.Ed.2d 469, 113 S.Ct. 2786].) . . . [¶] The trial court's preliminary determination whether the expert opinion is founded on sound logic is not a decision on its persuasiveness. The court must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion. Rather, the court must simply determine whether the matter relied on can provide a reasonable basis

for the opinion or whether that opinion is based on a leap of logic or conjecture. The court does not resolve scientific controversies. Rather, it conducts a 'circumscribed inquiry' to 'determine whether, as a matter of logic, the studies and other information cited by experts adequately support the conclusion that the expert's general theory or technique is valid.' [Citation.] The goal of trial court gatekeeping is simply to exclude 'clearly invalid and unreliable' expert opinion. [Citation.] In short, the gatekeeper's role 'is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.' [Citation.]" (*Sargon, supra*, 55 Cal.4th at p. 772.)

We review the trial court's ruling on the admissibility of expert testimony for abuse of discretion, except to the extent that the ruling is based on the court's conclusion of law, which we review de novo. (*Sargon, supra*, 55 Cal.4th at p. 773.) A court abuses its discretion if its ruling is " 'so irrational or arbitrary that no reasonable person could agree with it.' " (*Ibid.*) A court's discretion also is limited by the applicable principles of law. (*Ibid.*)

In this case, Kashar declared that he "conducted extensive examinations of the portions of the prosthetic device that were removed from Mr. Garrett using visual examination, optical microscopic examination, x-ray radiography, fluorescent dye penetrant examination, scanning electron microscopy, and such destructive testing as hardness testing, micro hardness testing, microstructural analysis, and chemical analysis." He declared that he had determined, based on his examinations, that the fractured portion of the prosthesis was softer than the "minimum required hardness" in two of the three ASTM specifications covering the alloy for use in an implant and was less than the "expected hardness" of the third specification.

We believe that this explanation is sufficient to support his opinion for purposes of opposing the summary judgment motion. In our view, Kashar's failure to describe the particular testing processes that he used to arrive at his conclusions regarding the hardness of the prosthesis and his failure to more particularly describe the results of that testing do not in any manner indicate that his conclusions are speculative, conjectural or lack a reasonable basis. Whatever shortcomings that cross-examination may or may not reveal in Kashar's testing methods and opinion, we believe that the absence of more specific information as to the testing methods used and the results obtained would not provide any grounds for the trial court to conclude that there was no reasonable basis for Kashar's opinion.

Our conclusion is the same with respect to Kashar's failure to identify the particular ASTM specifications that he considered. The absence of that information does not render the declaration conclusory and cannot justify the conclusion that there was no reasonable basis for Kashar's opinion. Moreover, Kashar's failure to expressly state that the prosthesis should have complied with the ASTM specifications for Cobalt-28% Chromium-6% Molybdenum alloy and his failure to expressly state that the purported defect was a cause of the device's failure are immaterial because those matters are readily inferable from the facts and opinion expressly stated.

Howmedica and Stryker contend Kashar's failure to describe the testing methods employed and the test results made it impossible for the trial court to determine whether the material on which he relied supported his opinion. Citing *Sargon, supra*, 55 Cal.4th 747, and Evidence Code section 802, defendants argue that a trial court is required to scrutinize the reasons for an expert's opinion and must determine whether the analytical gap between the data and the opinion is too great. They argue that lacking sufficient information to perform this required analysis, the trial court properly excluded Kashar's testimony. We conclude that the exclusion of Kashar's testimony cannot be affirmed on this basis.

*Sargon* involved the exclusion of expert testimony at trial. (*Sargon, supra*, 55 Cal.4th at p. 755.) Evidence Code section 802 allows the trial court to inquire into the reasons for an expert's opinion so as to determine whether those reasons are supported by the material on which the expert relies. (*Sargon, supra*, 55 Cal.4th at p. 771.) In *Sargon*, the trial court conducted that inquiry in an eight-day evidentiary hearing at which the expert was the primary witness. (*Id.* at p. 755.) After the hearing, the trial court in a 33-page ruling concluded that the expert's opinion on the lost profits of a small dental implant company was " 'not based upon matters upon which a reasonable expert would rely,' " that it was speculative and that the reasons for the opinion were unsupported by the material on which he relied. (*Id.* at pp. 766–767.) The trial court therefore excluded the expert testimony. (*Id.* at p. 767.)

*Sargon* discussed the expert's testimony and the trial court's ruling at length. (*Sargon, supra*, 55 Cal.4th at pp. 776–781.) *Sargon* stated, "To the extent that the expert relied on data that is not relevant to the measure of lost profit damages, the trial court acted within its discretion to exclude the testimony because it was not '[b]ased on matter . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . . .' (Evid.Code, § 801, subd. (b);

[citation].)" (*Id.* at p. 776.) *Sargon* stated that the trial court "properly found the expert's methodology was too speculative for the evidence to be admissible." (*Ibid.*) *Sargon* also stated that the expert's reasoning was circular and that "[t]he trial court properly considered this circularity in the reasoning as a basis to exclude the testimony under Evidence Code section 802." (*Id.* at p. 777.) *Sargon* concluded that "[t]he trial court properly acted as a gatekeeper to exclude speculative expert testimony" and did not abuse its discretion. (*Id.* at p. 781.)

Unlike *Sargon, supra,* 55 Cal.4th 747, this case involves the exclusion of expert testimony presented in opposition to a summary judgment motion. The trial court here did not conduct an evidentiary hearing, and there was no examination of an expert witness pursuant to Evidence Code section 802. Absent more specific information on the testing methods used and the results obtained, the trial court here could not scrutinize the reasons for Kashar's opinion to the same extent as did the trial court in *Sargon.* We do not believe, however, that the absence of such detailed information justified the exclusion of Kashar's testimony.

The rule that a trial court must liberally construe the evidence submitted in opposition to a summary judgment motion applies in ruling on both the admissibility of expert testimony and its sufficiency to create a triable issue of fact. (*Jennifer C. v. Los Angeles Unified School Dist.* (2008) 168 Cal.App.4th 1320, 1332–1333 [86 Cal.Rptr.3d 274]; *Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 125–126, 128–130 [59 Cal.Rptr.3d 618].) In light of the rule of liberal construction, a reasoned explanation required in an expert declaration filed in opposition to a summary judgment motion need not be as detailed or extensive as that required in expert testimony presented in support of a summary judgment motion or at trial. (*Jennifer C., supra,* at p. 1332; *Powell, supra,* at pp. 128–130.) Liberally construing the Kashar declaration, we conclude that the explanation provided for Kashar's opinion was sufficient and that the trial court could not properly exclude the expert testimony based on Kashar's failure to identify the particular tests employed or describe the test results.

We therefore hold that the trial court failed to liberally construe the declaration as required, and that the sustaining of the objections to the Kashar declaration based on Evidence Code sections 801, subdivision (b) and 802 was an abuse of discretion.

### b. *The Sustaining of the Objections Cannot Be Affirmed on Other Grounds*

Howmedica and Stryker also objected to portions of the Kashar declaration on the grounds that he was not qualified to testify as an expert. "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) Kashar stated in his declaration that he was "a metallurgist with more than 30 years of experience in materials analysis, failure analysis and material trade-off evaluation." He testified in his declaration on the nature and hardness of the materials used in the prosthesis, a subject for which his experience as a metallurgist undoubtedly qualified him as an expert.

Defendants' objections to portions of the Kashar declaration on grounds of lack of foundation and relevance, to the extent that they did not merely reiterate the same grounds that we have already rejected, were similarly meritless. No preliminary fact or other foundational matter was lacking, and Kashar's testimony clearly is relevant and creates triable issues of fact, as we now explain.

### c. *The Kashar Declaration Creates Triable Issues of Fact*

A product has a manufacturing defect if it differs from the manufacturer's intended result or from other ostensibly identical units of the same product line. (*Barker v. Lull Engineering Co., supra*, 20 Cal.3d at p. 429.) In other words, a product has a manufacturing defect if the product as manufactured does not conform to the manufacturer's design. (*In re Coordinated Latex Glove Litigation* (2002) 99 Cal.App.4th 594, 607 [121 Cal.Rptr.2d 301].) A manufacturing defect is a legal cause of injury only if the defect was a substantial factor in producing the injury. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 [34 Cal.Rptr.2d 607, 882 P.2d 298].)

Defendants' expert Burstein stated in his declaration filed in support of the summary judgment motion that he "conducted a detailed examination of the subject prosthesis" and reviewed Howmedica's records with regard to its design and manufacture. Based on his examination of the prosthesis and review of the records, he opined that the prosthesis "entirely met the specifications provided by Dr. Eckardt," that it "was manufactured by proper means and methods of the proper materials, as also accepted in the industry, for this product and application" and that it "was not defective in design or manufacture."

Kashar stated in his declaration filed in opposition to the summary judgment motion that he had determined through destructive testing and other examinations that the portion of the prosthesis that suffered a fracture "was softer tha[n] the minimum required hardness in two of the three ASTM specifications that cover Cobalt-28% Chromium-6% Molybdenum alloy for use as an implant material, and was less than the expected hardness of the third specification." He stated that hardness was a direct indication of the strength of the material. Kashar also stated that a portion of the prosthesis was not made from the cobalt-chromium-molybdenum alloy, but instead was made from a titanium alloy. He stated that these "anomalies" made the prosthesis defective in manufacture or design.

Although Kashar did not expressly state that the design specifications for the prosthesis provided for use of the Cobalt-28% Chromium-6% Molybdenum alloy, Garrett presented deposition testimony by Daniel G. Barcenas of Stryker stating that the prosthesis was designed to be made from "cobalt chrome" and not titanium. Eckardt also testified in his deposition that he designed the prosthesis to be constructed of "alloys . . . and of cobalt, chrome molybdenum."

We must construe the evidence liberally in favor of Garrett as the party opposing summary judgment and must resolve all doubts in the evidence in his favor. (*Miller, supra*, 36 Cal.4th at p. 460.) Accordingly, we conclude that the evidence, liberally construed, supports the proposition that the prosthesis was designed to be constructed of Cobalt-28% Chromium-6% Molybdenum alloy and not titanium alloy, and that it was intended to comply with the ASTM specifications for hardness covering the former alloy for use in an implant, but that a portion of the prosthesis was made from titanium alloy, and the portion that failed did not comply with the applicable ASTM specifications for Cobalt-28% Chromium-6% Molybdenum alloy. This creates a triable issue of fact as to whether the prosthesis as manufactured failed to conform to its intended design and therefore creates a triable issue of fact as to the existence of a manufacturing defect. In light of the evidence that the hardness of the material also affects its strength, the evidence also creates a triable issue of fact as to whether the purported manufacturing defect was a substantial factor in bringing about the failure of the prosthesis resulting in Garrett's injury. The triable issues of fact as to the existence of a manufacturing defect and causation preclude summary adjudication of the count for strict products liability based on a manufacturing defect and the count for negligence (see fn. 7, *ante*).

## DISPOSITION

The judgment is reversed with directions to the trial court to vacate the order granting summary judgment and enter a new order granting summary adjudication of the counts for failure to warn strict products liability, design defect strict products liability and breach of express warranty and otherwise denying the motion for summary judgment or summary adjudication. Garrett is entitled to recover his costs on appeal.

Klein, P. J., and Kitching, J., concurred.

Respondents' petition for review by the Supreme Court was denied June 12, 2013, S210018.