Filed 4/23/25  Greer v. Riverside Community Hospital CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MAUREEN P. GREER, as Successor in Interest, etc. et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> RIVERSIDE COMMUNITY HOSPITAL, <br><br> Defendant and Respondent. | D084257 <br><br><br> (Super. Ct. No. CVRI2201231) |

APPEAL from a judgment of the Superior Court of Riverside County, Godofredo Cuison Magno, Judge.  Reversed.

Etter, McMahon, Lamberson, Van wert & Oreskovich, Robert F. Greer, and John R. Williams, Attorneys for Plaitiffs and Appellants.

Dummit Buchholz & Trapp, Craig S. Dummit and John M. Racanelli, Attorneys for Defendant and Respondent.

Plaintiffs and appellants Maureen Greer, Brien Cassidy, and Kevin Cassidy (collectively Appellants) appeal a judgment dismissing their case after the court granted summary judgment in favor of defendant Riverside

Community Hospital (RCH).  Because we find there are genuine disputes of material fact, we reverse.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

This case arises from the death of Appellants' mother, Eileen Cassidy. Before her death, Cassidy suffered from Alzheimer's dementia and required at-home care.  Greer, Cassidy's daughter, had been granted power of attorney to make medical decisions on Cassidy's behalf.

In October 2020, Cassidy lost consciousness then began vomiting, leading her caregiver to call an ambulance.  A report from the responding emergency medical technicians stated, Cassidy was "on the toilet, no falls, no trauma noted, and shortly [after] the patient regained consciousness and vomited."  Cassidy was taken by ambulance to RCH's emergency room, arriving at 9:16 a.m.

Greer arrived at RCH shortly after Cassidy's ambulance, but due to COVID-19 restrictions, RCH did not allow family members inside.  Greer told an emergency room doctor and nurse that she had power of attorney for her mother, who had Alzheimer's.  She told them Cassidy "had these vomiting incidents at home periodically," and that an RCH doctor had previously instructed her "to always" have her mother sit upright with her head tilted in a downward position "to prevent her from swallowing any vomit and aspirating."  She told them Cassidy "was not to be left alone and that someone needed to be at her side at all times."  Greer wanted her mother released from the hospital, but the doctor and nurse "refused to release [her] and stated that they wanted to run some tests."  "The doctor and nurse told [Greer] that [Cassidy] would be properly supervised, would not be left alone, and that someone would be with her at all times."

2

At 10:11 a.m., an entry in Cassidy's chart noted her "[r]espirations [were] even and unlabored" and her "[b]ilateral lungs sounds [were] clear, equal and undiminished." The nurse noted the "[e]xpected outcome of [Cassidy's] chief complaint" was that she would be "[s]tabilized/maintained." After an X-ray, Cassidy's doctor wrote, "There are mild diffuse interstitial opacities throughout bilateral lung fields, new compared to prior study, likely due to pulmonary venous congestion/interstitial edema with superimposed perihilar atelectasis." Cassidy's records reflect "no reported fever, respiratory complaints, evident pain, or other symptoms." Appellants' expert opined that Cassidy's "vital signs were non-emergent, and . . . remained non-emergent for several hours."

The nurse noted in Cassidy's medical record that at 11:51 a.m., she was sleeping in the bed and not in acute distress. At approximately 12:27 p.m., the nurse told Greer that Cassidy's "lungs were clear" and that she could be discharged after obtaining a release from her primary care physician. Before Cassidy could be released, however, she "vomited two times and then suffered a sudden onset of fever and decreased oxygen saturation levels." Appellants' expert opined that "the failure to have someone properly supervise [Cassidy] at all times" caused her to aspirate vomit.

Cassidy "was diagnosed with acute hypoxic respiratory failure, requiring ventilation, likely secondary to aspiration pneumonia." A second chest X-ray at 3:10 p.m. showed "[d]iffuse bilateral interstitial opacities with superimposed patchy airspace opacities predominantly on the right likely due to multifocal pneumonia, atelectasis or edema." Cassidy's condition continued to decline over the course of the next two months, and according to Appellants' expert, "as a result of the aspiration of vomitus in the [emergency room], . . . Cassidy suffered injuries resulting in medical complications

3

necessitating multiple medical procedures . . . that ultimately [led] to her death on December 22, 2020."

Greer filed this wrongful death action in 2022, and her brothers later joined as plaintiffs. In 2023, RCH filed a motion for summary judgment supported by expert declarations from a medical doctor and a nurse. Appellants' opposition to the motion was supported by the declaration of Dr. Michael Bresler, "a member of the Emergency Medicine faculty at Stanford University" since 1978, and "a Clinical Professor Emeritus of Emergency Medicine" who has "received training and education in Emergency Medicine and been an instructor and teacher in multiple aspects of Emergency Medicine in hospitals." He claimed expertise in "the standard of care of hospitals in Emergency Department settings, and the standard of care for nurses in the Emergency Departments of hospitals" as well as "medical causation of a patient's injuries and conditions."

The trial court found in favor of RCH, concluding that Appellants had not shown any genuine disputes of material fact.[1] The trial court held RCH had met its initial burden on summary judgment through the declarations of its two expert witnesses. The court noted nurse Kate Clair opined "that the nurses and non-physician staff met the standard of care by appropriately monitoring and assessing [Cassidy], and followed doctor's orders"; that "the standard of care does not require a sitter based on a family request only"; and "that the care and treatment provided by the non-physician staff complied with the applicable standard of care and was in compliance with the physician's order." The court noted Dr. David Barcay opined "that there was no medical reason for a sitter to stay with [Cassidy] during her time in the

---

[1] Appellants failed to include a copy of the trial court's order in the record on appeal. However, we take judicial notice of the court's January 11, 2024, ruling.

4

emergency room, regardless of the request of family, as there was no behavior exhibited by decedent that would have required it (i.e. pulling out lines, getting up, being a danger)"; and that the "care and treatment rendered to [Cassidy] by [RCH] staff and independent physicians complied with or exceeded the applicable standard of care and that no act caused or contributed to any harm to decedent as they could not prevent her from vomiting in the emergency room."

The court found Appellants "did not present any evidence to dispute Nurse Clair's declaration," and "while Dr. Bresler testifies that [RCH] breached of [*sic*] standard of care to fail [*sic*] to have someone continuously supervise [Cassidy] as requested by Greer, he does not explain his conclusion that the standard of care for an emergency room requires following a family member's request." Apparently relying on the purported failure to rebut Nurse Clair's declaration, the court held Appellants had not "present[ed] evidence that the actions of the non-physician/nursing staff caused or contributed to decedent's injuries and eventual death."

## II. DISCUSSION

A.    *Standard of Review*

We independently review the trial court's order granting RCH's motion for summary judgment. (*Ryan v. Real Estate of Pacific, Inc.* (2019) 32 Cal.App.5th 637, 642.) A defendant is only entitled to summary judgment if "there is no genuine dispute of material fact and . . . it is entitled to judgment as a matter of law." (*Jones v. Awad* (2019) 39 Cal.App.5th 1200, 1207 (*Jones*).) We "may not weigh the evidence but must instead view it in the light most favorable to the opposing party and draw all reasonable inferences in favor of that party." (*Weiss v. People ex rel. Department of Transportation* (2020) 9 Cal.5th 840, 864.) RCH's declarations in support of

5

its motion " 'should be strictly construed, while the opposing declarations should be liberally construed.' " (*Fernandez v. Alexander* (2019) 31 Cal.App.5th 770, 779.) "[A] reasoned explanation required in an expert declaration filed in opposition to a summary judgment motion need not be as detailed or extensive as that required in expert testimony presented in support of a summary judgment motion or at trial." (*Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 189.)

B.    *Appellants Have Demonstrated Genuine Disputes of Material Fact*

Appellants allege that Cassidy's wrongful death resulted from medical malpractice by RCH personnel. "The elements of a cause of action for medical malpractice are: (1) a duty to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) a breach of the duty; (3) a proximate causal connection between the negligent conduct and the injury; and (4) resulting loss or damage." (*Johnson v. Superior Court* (2006) 143 Cal.App.4th 297, 305.) The first element, also called the standard of care, must be proven by expert testimony unless the circumstances are such that the required conduct is within the layperson's common knowledge. (*Landeros v. Flood* (1976) 17 Cal.3d 399, 410.)

We conclude genuine disputes of material fact preclude summary judgment in favor of RCH. Appellants adduced competent evidence tending to show: (1) personnel at RCH were informed of Cassidy's history of "vomiting spells" and the need for supervision to help prevent her from aspirating; (2) it was a violation of the standard of care to fail to supervise Cassidy; (3) Cassidy aspirated vomit while in RCH's care; (4) she likely would not have aspirated vomit had she been supervised and seated in the proper position; and (5) aspirating vomit in the emergency room was a cause of her death. Appellants have thus demonstrated "genuine dispute[s] of material

6

fact" that preclude summary judgment. (*Jones, supra*, 39 Cal.App.5th at p. 1207.)

The trial court first held Appellants "did not present any evidence to dispute Nurse Clair's declaration." RCH similarly argues that Bresler "can opine on the standard of care for emergency medicine physicians, but has no certification, expertise or relevant knowledge to render expert opinions on the standard of care attributable to nurses, hospitals or hospital employees." However, Bresler's declarations support his qualification to speak to the standard of care for both doctors and nurses as well as a hospital emergency department more generally.

Bresler's declaration states:

"I am board certified in Emergency Medicine. I have been a member of the Emergency Medicine faculty at Stanford University from 1978 through present, and I am currently a Clinical Professor Emeritus of Emergency Medicine. During the course of my medical career, I have received training and education in Emergency Medicine and been an instructor and teacher in multiple aspects of Emergency Medicine in hospitals. Based upon my extensive background, training, education, and experience set forth in my attached CV, I am competent to express opinions regarding the standard of care of hospitals in Emergency Department settings, and the standard of care for nurses in the Emergency Departments of hospitals."

Specifically with respect to nurses, Bresler added:

"I was Medical Director of Stanford's Mobile Intensive Care Emergency Nurse Training Program as well as Medical Director of Stanford's Life Flight Helicopter Program. Both of these positions were emergency nurse training programs. Not only did I supervise the nurses' training, but I also gave innumerable lectures to nurses. These positions also included the direct supervision and evaluation of nurses' ongoing performance. In addition, I also had a faculty appointment as a preceptor at U.C. Davis Medical School's Emergency Nurse Practitioner Training

7

program, supervising the Master's in nursing candidates as they did their clinical rotations in Stanford's Emergency Department.

"As Medical Director of the Department of Emergency Medicine at Mills, and later Mills-Peninsula Hospitals (after their merger), and Acting Director of Stanford's Emergency Department, part of my role was both direct supervision as well as administrative evaluation of the performance of the nurses at all three hospitals. Moreover, I spent decades sitting on each hospital's quality assurance committees, evaluating their medical care, including nursing care, in the Emergency Departments."

This evidence demonstrates Bresler is qualified to speak to the standard of care for hospitals and nurses.

Although both the trial court and RCH cite *Lattimore v. Dickey* (2015) 239 Cal.App.4th 959, there the court held "even if we liberally construe [the expert's] declaration, it does not indicate that he possesses any certification, expertise or relevant knowledge of the standards of care attributable to nurses, hospitals or hospital employees, other than physicians or surgeons." (*Id.*, at p. 670.) That is plainly not the case with Bresler's declaration.

The trial court also held that "Plaintiffs do not present evidence that the actions of the non-physician/nursing staff caused or contributed to decedent's injuries and eventual death." This appears to stem from the trial court's erroneous conclusion that Bresler was not qualified to speak to the standard of care for nurses or other nonphysician personnel. Bresler's declaration says Greer informed a physician and a nurse of the danger of aspiration if no attendant was present; that the failure to have an attendant was a cause of Cassidy's aspiration; and that aspirating vomit in the emergency room led to her death. Whether this failure is attributable to physicians or "non-physician/nursing staff" does not matter, as Appellants' claims are against RCH, not against any individual employee.

8

The trial court further held that "while Dr. Bresler testifies that Defendant breached of [*sic*] standard of care to fail [*sic*] to have someone continuously supervise [Cassidy] as requested by Greer, he does not explain his conclusion that the standard of care for an emergency room requires following a family member's request." But Bresler did not opine that the hospital breached the standard of care because it did not follow a family member's request. Rather, he stated:

> "On October 19, 2020, Mrs. Greer specially requested and told the [ER] nurse, Joel Lawrence, and the [ER] doctor that her mother Eileen Cassidy had disabilities from her Alzheimer's and needed to have a sitter or someone at her side at all times *to prevent aspiration*. The RCH nurse and staff promised and assured Mrs. Greer that the hospital would have someone at Eileen Cassidy's side at all times while she was in the [ER]. Mrs. Greer relied upon these representations. The failure of RCH to have someone continuously supervise Eileen Cassidy, as promised and assured by the hospital nurse, was a violation of the standard of care for hospitals. In reviewing the ER records, there was no indication that someone was continuously supervising Eileen Cassidy. The failure to have someone properly supervise Eileen at all times, and that she not be left alone, as promised, was a violation of the standard of care. This violation of the standard of care was a cause of the aspiration of vomit at or around 1:30 pm on October 19, 2020, in the [ER] at RCH." (Emphasis added.)

Bresler thus stated that RCH personnel had reason to know Cassidy had a medical condition and history that warranted supervision to prevent aspiration, not that supervision was required simply because a family member asked for it.

RCH claims Bresler "did not provide any evidentiary support for his conclusory statement that decedent was not supervised." But RCH did not move for summary judgment on the ground that Cassidy was supervised. Rather, it moved on the ground that a supervisor was not medically necessary and would not have prevented Cassidy from aspirating vomit.

9

Indeed, RCH effectively conceded Cassidy was not supervised in its statement of undisputed facts, claiming "a patient in the emergency [room] does not get a sitter unless there are medical indications for one," and "[t]here was no medical reason that required a sitter to stay with [Cassidy] in the ER prior to or at the time that she vomited."

RCH also argues that "Bresler . . . did not explain why a sitter was medically necessary." But Bresler opines that RCH personnel were made aware of credible information that Cassidy required supervision to prevent aspiration and that it was a violation of the standard of care to not provide supervision in these circumstances.

Finally, RCH claims Bresler's causation opinion is "conclusory," but does not explain this contention. An undeveloped argument is a forfeited one. (*Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 701, fn. 15 [failure to develop an argument forfeits that point].) Indeed, RCH affirmatively waives reliance on causation as an alternative basis for affirmance, repeatedly stating "[c]ausation is not an issue in this case," and "causation argument[s are] irrelevant [to] this appeal." And, in any case, with specificity, Bresler cites to and discusses relevant aspects of Cassidy's medical records, including that she was stable before vomiting in the emergency room, at which point she "suffered a sudden onset of fever and decreased oxygen saturation levels."

We do not address the remainder of Appellants' arguments, including their evidentiary contentions, as these are not necessary to our disposition.

## DISPOSITION

The judgment is reversed. The matter is remanded to the superior court with directions to enter an order denying RCH's motion for summary

judgment.  Appellants shall recover costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(2).)

KELETY, J.

WE CONCUR:


IRION, Acting P. J.


BUCHANAN, J.