Filed 3/26/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JILLIAN MICHAELS et al., | B300093 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. SC126100) |
| v. | |
| GREENBERG TRAURIG, LLP, et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mark A. Young, Judge. Reversed and remanded.

King & Ballow, Richard S. Busch and D. Keith Kelly, II, for Plaintiffs and Appellants.

Jenner & Block, Michael P. McNamara, Kirsten H. Spira and AnnaMarie A. Van Hoesen for Defendants and Respondents.

_____

Jillian Michaels and Empowered Media, LLC (together Appellants), filed a complaint against Greenberg Traurig (a law firm) and its shareholder partner, David Markman (together Respondents), for nine causes of action including legal malpractice. The malpractice claim, central to this appeal, involved negotiating a branding contract with a diet supplement company called ThinCare International, LLC ("ThinCare").

Respondents filed a motion for summary adjudication on six of the nine causes of action. The trial court granted the motion on all six causes of action finding lack of factual support for causation and damages, and a lack of factual support on fraudulent concealment. Several months later, Appellants moved to dismiss the remaining causes of action which was granted on August 12, 2019. Thereafter, Appellants timely appealed.

Appellants contend the trial court erred on various legal bases, including failing to view the evidence in the light most favorable to them and challenge the trial court's ruling except on the eighth cause of action (fraudulent concealment). We hold, the trial court abused its discretion by excluding portions of Appellants' expert witness's declaration on damages. Further, the trial court erred in granting the summary adjudication on the first, second, third, fifth and seventh causes of action. Accordingly, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

Jillian Michaels is a fitness celebrity who appeared on several seasons of the NBC's television series called *The Biggest Loser*. Empowered Media, LLC (Empowered) is a company she co-owns.

In 2008, Michaels and Empowered hired Greenberg Traurig and its transactional partner, David Markman, to

negotiate various deals. In mid-2009, Markman represented Michaels and Empowered with two contracts at issue in this case. The first involved Michaels' appearance on the television show, *The Biggest Loser*. This contract was executed on May 6, 2009, with a production company called BL4 Productions, Inc. (the "2009 *Biggest Loser* Agreement"). The second contract was for branding and promotional services (to be performed by Michaels) between a maker of nutraceutical products called ThinCare and Empowered, executed on May 8, 2009 (the "ThinCare Agreement").

The 2009 *Biggest Loser* Agreement contained certain specified restrictions on Michaels' ability to participate in commercials.[1] The ThinCare Agreement executed after the 2009 *Biggest Loser* Agreement contained warranty provisions inconsistent with the commercial restrictions in the 2009 *Biggest Loser* Agreement.[2] The gravamen of the malpractice claim is

---

[1] The restrictive provision in the 2009 *Biggest Loser* Agreement specified in pertinent part, "Artist shall not render services or appear on-camera or off-camera in any commercials (including infomercials). Notwithstanding the foregoing, subject to the conditions set forth . . . above, Artist may render services on one (1) national commercial campaign during each year hereunder, subject to the reasonable approval of the television network to which Company has granted the initial broadcast rights to the Series . . . ."

[2] Section 11 of the ThinCare Agreement provided in pertinent part:
"*Section 11 (b)(iii)* – [Empowered] has entered into no other agreement or contract and is not subject to any order, decree or ruling, which would prohibit [Empowered] from

3

Markman's alleged failure to advise Appellants on this inconsistency between the 2009 *Biggest Loser* Agreement and the ThinCare Agreement.

Pursuant to the ThinCare Agreement, Empowered was paid a royalty advance of $2 million and was entitled to royalties based on a sliding scale between 8 and 11 percent.[3] The length of the ThinCare Agreement was four years from the launch of the first product until on or about August 1, 2013. ThinCare paid Empowered a total of $5,531,153 in royalties over the life of the ThinCare Agreement.

At the start of 2010, ThinCare and the Appellants were sued in four separate class actions alleging the products were falsely advertised. These lawsuits were eventually dismissed.

On January 21, 2011, ThinCare filed a complaint against the Appellants in the federal district court in Utah (ThinCare Litigation). Among other claims, ThinCare alleged a cause of action for fraud in the inducement based on the "false" warranties contained in the ThinCare Agreement. Appellants

---

performing its obligations under this Agreement or permitting (ThinCare] to exercise the rights granted herein;

"*Section 11 (b)(iv)* – (Empowered ]is the sole owner of the Jillian Michaels identifications, or has the sole and exclusive right to use the Jillian Michaels Identifications . . . by [ThinCare ]as provided herein, does not and will not infringe the rights of any third party."

[3] Pursuant to the terms of the ThinCare Agreement, Empowered was to be paid royalties of 11 percent for the first $25 million in net sales, 10 percent for the next $25 million to $50 million in net sales, 9 percent for the next $50 million to $75 million in net sales, and 8 percent above $75 million in net sales.

4

retained Greenberg Traurig and its litigation partner, Matthew Steinberg, along with a Utah based law firm, Strong & Hanni, to defend the suit. As the case progressed, Strong & Hanni became Appellants' sole legal representation.

On July 12, 2013, ThinCare and the Appellants settled by executing a Memorandum of Understanding. The terms of the Memorandum of Understanding provided: (1) Appellants would pay ThinCare $2.2 million, (2) Empowered would waive its claim to the $1,299,814.72 that was held in escrow, and (3) Appellants agreed to permit ThinCare to sell Michaels' branded products until April 30, 2016 without any payment of royalties. Prior to the termination of the ThinCare Agreement, ThinCare and Empowered Media Supplements, LLC (affiliated with Empowered) entered into an "Amended and Restated Licensing Agreement" for the continued sale of Michaels' branded products until June 1, 2018. Under this new agreement, Empowered Media Supplements, LLC received an advance of $100,000 and royalties after recoupment of the advance.

On December 16, 2012, during the ThinCare lawsuit, Appellants and Midtown Equities began discussing the possibility of a licensing deal to sell Michaels' branded supplement products. In May of 2013, Markman drafted a proposed agreement with Midtown Equities which they reviewed. The two sides, however, never reached a meeting of the minds and the deal was never consummated.

Appellants filed the initial complaint in the instant case on July 7, 2016. The operative second amended complaint, filed on February of 2017, alleged nine causes of action (1) legal malpractice, (2) breach of fiduciary duty, (3) breach of contract, (4) declaratory relief to rescind and void contingent fee contract

5

for services, (5) declaratory relief to rescind and void litigation agreement, (6) unfair business practice in violation of Business and Professions Code section 17200 et seq., (7) negligent misrepresentation, (8) fraudulent concealment, and (9) violation of the Lanham Act (15 U.S.C. § 1125 et seq.).

On December 10, 2018, Respondents filed their motion for summary adjudication on six out of the nine causes of action. The trial court conducted the hearing on January 31, 2019 and issued its final ruling on February 5, 2019. In its ruling, the trial court excluded Appellants' expert witness's declaration on future damages as speculative and not supported by the record. The trial court granted the motion on all six causes of action based on a lack of factual support on causation and damages (first, second, third, fifth and seventh causes of action) and a lack of factual support on the fraudulent concealment cause of action (eighth cause of action). It denied Respondents' alternative contentions based on the doctrine of unclean hands and the relevant statute of limitations.

On August 12, 2019, Appellants moved to dismiss the remaining causes of action which the trial court granted on the same day. This appeal followed.

## DISCUSSION

Appellants contend the trial court erred in granting Respondents' motion for summary adjudication as to their first, second, third, fifth, and seventh causes of action. We agree.

## I. STANDARD OF REVIEW

A party may move for summary adjudication to resolve causes of action, affirmative defenses, damages, or issues of duty. (Code Civ. Proc., § 437c, subd. (f)(1).) Procedurally, a summary

6

adjudication motion is treated the same as a summary judgment motion. (*Id.*, subd. (f)(2).)

"On appeal after a motion for summary judgment [or summary adjudication] has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. [Citation.]" (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089]; *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767 [107 Cal.Rptr.2d 617, 23 P.3d 1143].) "In ruling on the motion, the court must 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom [citation], and must view such evidence [citations] and such inferences [citations], in the light most favorable to the opposing party.' (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).)

The moving party, whether the plaintiff or the defendant, bears the initial burden or production "to make a prima facie showing of the nonexistence of any trial issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar*, *supra*, 25 Cal.4th at p. 850.)

The moving party also bears the burden of persuasion which, unlike the burden of production, never shifts. In *Aguilar*, California's Supreme Court explained, "[o]n summary judgment, the moving party's burden is more properly labeled as one of *persuasion* rather than *proof*. That is because, in order to carry such burden, he must *persuade* the court that there is no material fact for a reasonable trier of fact to find, and not *prove* any such fact to the satisfaction of the court itself as though it

7

were sitting as the trier of fact." (*Aguilar, supra*, 25 Cal.4th at p. 845, fn. 4.)

"[I]f a defendant moves for summary judgment against . . . a plaintiff, he must present evidence that would require a reasonable trier of fact *not* to find any underlying material fact more likely than not–otherwise, *he* would not be entitled to judgment *as a matter of law*, but would have to present *his* evidence to a trier of fact." (*Aguilar, supra*, 25 Cal.4th at p. 851.)

## II. TRIAL COURT'S RULING ON OBJECTIONS – ABUSE OF DISCRETION

Before addressing the merits of Respondent's summary adjudication motion, we must determine whether the trial court abused its discretion by excluding Appellants' expert witness's opinion on future profits. Here, "[a] different analysis is required for our review of the trial court's . . . rulings on evidentiary objections. Although it is often said that an appellate court reviews a summary judgment motion 'de novo,' the weight of authority holds that an appellate court reviews a court's final rulings on evidentiary objections by applying an abuse of discretion standard. [Citations.]" (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694 [23 Cal.Rptr.3d 915].)

We start by reviewing relevant laws on the trial court's role in assessing whether to admit or exclude an expert witness's opinion on calculation of damages.

### A.    Legal Principles

"[U]nder Evidence Code sections 801, subdivision (b),[4] and 802,[5] the trial court acts as a gatekeeper to exclude expert

---

4       Evidence Code section 801 states:

opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative. Other provisions of law, including decisional law, may also provide reasons for excluding expert opinion testimony." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771–772 (*Sargon*).)

In *Sargon, supra*, 55 Cal.4th 747, the California Supreme Court applied these principles to determine whether the trial

---

"If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is:

"(a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and

"(b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

[5] Evidence Code section 802 states:

"A witness testifying in the form of an opinion may state on direct examination the reasons for his opinion and the matter (including, in the case of an expert, his special knowledge, skill, experience, training, and education) upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion. The court in its discretion may require that a witness before testifying in the form of an opinion be first examined concerning the matter upon which his opinion is based."

9

court erred in sustaining an objection to exclude expert witness's opinion on future profits. The *Sargon* court drew a distinction between established and unestablished businesses in assessing the admissibility of such opinions.

Regarding established businesses, " '[l]ost profits . . . may be recovered if their extent and occurrence can be ascertained with reasonable certainty; once their existence has been so established, recovery will not be denied because the amount cannot be shown with mathematical precision. [Citations.] Historical data, such as past business volume, supply an acceptable basis for ascertaining lost future profits. [Citations.] In some instances, lost profits may be recovered where plaintiff introduces evidence of the profits lost by similar businesses operating under similar conditions. [Citations.]' " (*Sargon, supra*, 55 Cal.4th at p. 774.)

Where an unestablished businesses is " 'prevented or interrupted, damages for prospective profits that might otherwise have been made from its operation are not recoverable for the reason that their occurrence is uncertain, contingent and speculative. [Citations.] . . . But although generally objectionable for the reason that their estimation is conjectural and speculative, anticipated profits dependent upon future events are allowed where their nature and occurrence can be shown by evidence of reasonable reliability.' [Citation.]" (*Sargon, supra*, 55 Cal.4th at p. 774.)

The question of speculation extends beyond the framework of analyzing established and unestablished businesses. For example, the expert witness in *Sargon* testified that Sargon Enterprises would develop a research and development department, like the "Big Six," to compete with them. The expert

further assumed Sargon Enterprises would replace one of the "Big Six" and that, the competitors would have taken no steps to contend with their new competitor. (*Sargon, supra*, 55 Cal.4th at p. 780.) Such assumptions, unless tethered to appropriate factual foundation, may also render an opinion speculative.

Additionally, "courts must also be cautious in excluding expert testimony. The trial court's gatekeeping role does not involve choosing between competing expert opinions. The high court warned that the gatekeeper's focus 'must be solely on principles and methodology, not on the conclusions that they generate.' [Citation.]" (*Sargon, supra,* 55 Cal.4th at p. 772.) Noting that calculation of lost profits must be certain as to their occurrence and extent, mathematical precision is not required. (*Id.* at p. 774.)

In *Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173 (*Garrett*), the court discussed the standard for admitting expert opinions in a motion for summary judgment or adjudication. *Garrett* concerned a patient's products liability action against designers and manufacturers of prosthetics devices. In moving for summary adjudication, the defendants lodged an expert's declaration that the prosthetic device, used to replace a portion of the femur, was not defective. (*Id.* at p. 179.) The plaintiff, in opposition to the summary adjudication motion, filed its own expert witness declaration refuting the defendant's expert witness opinion. The trial court found the plaintiff's expert's declaration lacking in adequate factual foundation and excluded the declaration.

The court reversed finding the trial court abused its discretion. The *Garrett* court analyzed *Sargon* and explained, "*Sargon* involved the exclusion of expert testimony at trial.

11

[Citation.] Evidence Code section 802 allows the trial court to inquire into the reasons for an expert's opinion so as to determine whether those reasons are supported by the material on which the expert relies. [Citation.]" (*Garrett, supra*, 214 Cal.App.4th at p. 188.)

The court reasoned, "[u]nlike *Sargon*, [citation] this case involves the exclusion of expert testimony presented in opposition to a summary judgment motion. The trial court here did not conduct an evidentiary hearing, and there was no examination of an expert witness pursuant to Evidence Code section 802. Absent more specific information on the testing methods used and the results obtained, the trial court here could not scrutinize the reasons for [plaintiff's expert witness's] opinion to the same extent as did the trial court in *Sargon*. We do not believe, however, that the absence of such detailed information justified the exclusion of [plaintiff's expert witness] testimony." (*Garrett, supra*, 214 Cal.App.4th at p. 189.)

The court further explained, "[t]he rule that a trial court must liberally construe the evidence submitted in opposition to a summary judgment motion applies in ruling on both the admissibility of expert testimony and its sufficiency to create a triable issue of fact. [Citations.] In light of the rule of liberal construction, a reasoned explanation required in an expert declaration filed in opposition to a summary judgment motion need not be as detailed or extensive as that required in expert testimony presented in support of a summary judgment motion or at trial. [Citations.] Liberally construing the [plaintiff's expert witness] declaration, we conclude that the explanation provided for [plaintiff's expert] opinion was sufficient and that the trial court could not properly exclude the expert testimony

12

based on [expert witness's] failure to identify the particular tests employed or describe the test results." (*Garrett*, *supra*, 214 Cal.App.4th at p. 189.)

Thus a distinction is drawn between the trial court's gatekeeping function at a motion in limine, and, the trial court's role in ruling on the admissibility of the expert witness who offers a declaration in opposition to a summary judgment motion. At a motion in limine before a court or a jury trial, the trial court does not view the evidence in the light favoring either party. In ruling on the admissibility of evidence in a summary adjudication motion, the trial court liberally construes the evidence in favor of the party opposing the summary adjudication motion.

## B. Analysis

On the question of lost profits, Appellants offered the declaration of their expert, Sidney P. Blum, a certified public accountant, licensed in California and New York. He worked as a partner in several accounting firms including KPMG. He also worked as the Chief Audit Officer for Beats Electronics, LLC, and currently operates a consulting business on financial damages, royalty audits, and expert witness services. He has experience over royalty agreement negotiations which involved over $1 billion in annual sales and hundreds of millions of dollars in royalties. Blum offered lost profit opinions on (1) the ThinCare Agreement, and (2) the potential Midtown Equities deal. The trial court excluded both.[6] We analyze each in turn.

---

[6] In the trial court's final order for the summary adjudication, the court set forth its objection rulings by noting the number sequentially. When compared to the Defendants' Objections to Evidence Submitted in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Adjudication, the

13

## 1. ThinCare Agreement

On the ThinCare Agreement, Blum resorted to the American Institute of Certified Public Accounts (AICPA) for guidance on calculating damages. According to Blum's declaration, he used a method termed the "Before and After Method" which "considers the profit the [Appellants] would have received but for the actions of the [Respondents], and these but for profits are reduced by any actual benefits that the [Appellants] did receive through mitigation of damages or other sources." Blum divided the contract into two periods (before/after) with the after periods further subdivided into two parts. The "Before" period entailed 16 royalty payments from ThinCare to the Appellants with an average royalty payment of $351,204. The "Before" period reflected the actual royalties received from ThinCare up until ThinCare litigation in 2011.

According to Blum, the "Before" period was impacted by several significant market conditions that affected sales (1) the class action litigations that started in February of 2010, and (2) the ThinCare litigation which prevented Michaels from actively marketing the products. Blum opined sales are a direct result of marketing and that, had it not been for the ThinCare litigation, Michaels could have resumed marketing activities thereby increasing the ThinCare product's sales.

Regarding the "After" period, Blum broke down the time periods into (1) November 2011 to July 2013 (time from when the last class action suit ended until the end of the ThinCare

---

numbers do not line up. However, both appellants and the respondents agree in their briefing, the trial court excluded Blum's opinions on lost profits.

14

litigation), and (2) August 2013 to April 2016.  Blum calculated the lost profits from the period of November 2011 to July 2013 as $7,375.279, and from the period of August 2013 to April 2016 as $11,589,723.  This is arrived at by multiplying the average royalty payment from the "Before" period by the number of months in each of the "After" periods.

On excluding Blum's expert opinion, the trial court reasoned, "Court  . . . believes that Mr. Blum's expert testimony that Plaintiff lost between $7.3 million and $11.5 million in royalties from the ThinCare deal is entirely too speculative and based upon assumptions that are not supported by the record.  (Blum Decl. ¶25)."

A review of Blum's declaration reveals the assumption the trial court noted was not supported by the record, namely, that Michaels was prevented from conducting further promotional and marketing activities because of the ThinCare Litigation.  This assumption was crucial to Blum's expert opinion.  His entire opinion on future profits rested on the premise of marketing.  In the same paragraph, Blum opined, "[Appellants'] damage calculation must consider the lack of active marketing of the products because sales are a direct result of marketing."  Thus, the following progression of concepts may be extrapolated from Blum's opinion:  (1) ThinCare product sales are a direct result of marketing, (2) level of profits depends on Michaels' involvement with marketing, (3) Michaels was prevented from marketing because of the ThinCare Litigation, and, (4) if the ThinCare litigation would not have occurred, Michaels would have continued to market ThinCare products into the "After" period.

Earlier in its final order, the trial court addressed the question of whether Michaels would have continued marketing by

15

noting, "[Respondents] ha[ve] presented uncontroverted evidence that [Michaels] had stopped supporting the ThinCare products before the litigation was filed causing a precipitous decline in sales. [Michaels] has provided no evidence indicating that she would have continued supporting the ThinCare products despite her stated concerns regarding false advertising, damage to her image, and other matter had the litigation never been filed." In support of this conclusion, the trial court listed various exhibits lodged by the Respondents that together show prior to ThinCare filing suit against the Appellants on January 11, 2011, Appellants were dissatisfied with ThinCare's actions including (1) failure to comply with the contract's product approval procedure, and (2) failure to comply with the royalty reporting and payment procedure. The trial court referenced another document which shows, in a deposition taken in connection with the ThinCare Litigation, Michaels believed ThinCare, on some occasions, had engaged in false advertising exposing both to the threat of law suits.

The trial court's conclusion, however, is contradicted by Michaels' declaration filed in opposition to the summary adjudication motion. There, Michaels indicated "prior to the filing of the ThinCare Litigation, I continued to actively promote the products. At the instruction of the litigation firm representing both ThinCare and [Empowered] in the class action lawsuits, I limited my promotional and marketing activity during the class action lawsuits. When the class actions stopped, I would have continued to meet my marketing and promotional obligations under the contract, but for the litigation filed by ThinCare." This declaration is admittedly self-serving, however, "[m]odern courts have recognized that all evidence proffered by a

16

party is intended to be self-serving in the sense of supporting the party's position, and it cannot be discounted on that basis." (*Oiye v. Fox* (2012) 211 Cal.App.4th 1036, 1050.)

The record contains additional evidence that show Michaels continued to participate in ThinCare's marketing activities. For example, an e-mail from Giancarlo Chersich, the CEO for Empowered, dated March 17, 2010, after the filing of the class action suit, highlights an exchange between ThinCare and Empowered discussing Michaels' promotional activities as required under the ThinCare Agreement.

We acknowledge, evidence within the record reveals Michaels was unhappy in her dealings with ThinCare prior to the ThinCare litigation. However, in a summary adjudication motion, the trial court does not weigh the evidence. Instead, the court is required to "view the evidence in the light most favorable to plaintiffs as the parties opposing summary judgment, strictly scrutinizing defendants' evidence in order to resolve any evidentiary doubts or ambiguities in plaintiffs' favor. [Citation.]" (*Dammann v. Golden Gate Bridge, Highway & Transportation Dist.* (2012) 212 Cal.App.4th 335, 340-341.) On this issue of facts assumed by Blum, the trial court failed to liberally construe the evidence in the light most favorable to the Appellants.

Another factual assumption, apparent from Blum's opinion is that ThinCare and Appellants would have continued with their contractual relationship beyond the initial ThinCare Agreement. This relates to the second part of the "After" period, from August of 2013 to April of 2016. Blum calculated the lost profits from this period to be $11,589,723.

The four-year time period of the ThinCare Agreement, which had an expiration date of around August of 2013, was

17

extended based on the Memorandum of Understanding to settle the ThinCare litigation. To offer an opinion, but for the ThinCare litigation, Appellants would have earned future profits, and, at the same time, extend the time period of the ThinCare Agreement based on the Memorandum of Understanding that settled the ThinCare Litigation appears inconsistent and conjectural. We agree with the trial court that this factual assumption was not properly supported by the record.

However, this alone does not resolve the question on whether the trial court abused its discretion in excluding the future profits' declaration by Blum. We must also determine whether his opinion was speculative. We analyze this question through the framework discussed in *Sargon*.

On calculating lost profits, *Sargon* drew a dichotomy between established and unestablished businesses. (*Sargon*, *supra,* 55 Cal.4th at p. 774.) In the case of established businesses, lost profits may be reasonably ascertained by looking at the business's past performance to extrapolate potential future earnings. For unestablished businesses, past performance may be objectionable as speculative. However, " 'anticipated profits dependent upon future events are allowed where their nature and occurrence can be shown by evidence of reasonable reliability.' " (*Ibid.*)

Blum's "Before and After Method" applied to the ThinCare Agreement falls within *Sargon*'s established business dichotomy. ThinCare manufactured and sold Michaels branded products for approximately 16 months until ThinCare filed suit against the Appellants (the "Before" period).

Here, we note several legal principles that apply. First, the court's role in determining the admissibility of expert witness's

18

opinion "does not involve choosing between competing expert opinions." (*Sargon*, *supra*, 55 Cal.4th at p. 772.) The court's role is limited to analyzing principles and methodologies, not the conclusions generated. (*Ibid.*)

The ThinCare business operated for approximately 16 months prior to the ThinCare Litigation, which served as the basis for Blum's future profits calculation. He used actual data from ThinCare's sale of Michaels' branded products to arrive at this calculation. The methodology used, the "Before and After Method," is approved by the American Institute of Certified Public Accountants. While the methodology used must also fit the facts on which it is applied, Blum had over a year's worth of data from ThinCare's sales to provide his opinion.

Respondent cites *Berge v. International Harvester Co.* (1983) 142 Cal.App.3d 152, which held that an award of future damages for plaintiff's two-year-old trucking business could not be sustained after a jury verdict since the business never earned a consistent profit. *Berge*, however, may be distinguished on several grounds. First, the Court of Appeal in *Berge* was not dealing with a summary adjudication motion, but instead, reviewing a jury verdict that awarded lost profits under the sufficiency of the evidence standard. Second, facts under *Berge* do not line up with the instant case. In *Berge*, the expert offered an opinion on lost profits based not on the actual profits generated by the business, but instead, on a national average. The *Berge* court found this testimony speculative as it had no correlation to the plaintiff's business. (*Id.* at pp. 162-163.) In the instant case, Blum relied on data from ThinCare's business to calculate lost profits.

On the ThinCare Agreement, we hold that the trial court abused its discretion in excluding Blum's expert opinion on the "Before" period, and, on the first "After" period from November 2011 to July 2013, calculated as $7,375,279. The trial court did not abuse its discretion in excluding Blum's opinion on the second "After" period as an assumption not supported by the record.

### 2. Midtown Equities Deal

The trial court also excluded Blum's expert opinion on lost profits for the Midtown Equities deal. In excluding this opinion, the trial court explained, "[t]he Court has further concerns that any lost profits from the Midtown Equities deal would be entirely too speculative. The Court . . . does not believe that [Appellants'] ha[ve] established a basis for its expert witness to opine that Midtown Equities, which had never operated in this field or fielded any similar product, would generate profits for [Appellants] between $10 million and $90 million. [Citation.] At least part of Mr. Blum's opinion is based upon terms of draft agreements that were drafted by [Appellants] and never agreed to by Midtown Equities."

Here, the business was literally unestablished. Midtown Equities is owned by Joe Cayre whose business is in real estate investments and development, not in the production and sale of dietary supplements. Cayre declared, "[a]fter many months of frustrating negotiations, we ultimately decided that we did not wish to do a deal with [Michaels] anyway because [the CEO of Empowered] was difficult to work with and taking up too much of our time." He further declared, "I did not pass on the deal because of anything related to the ThinCare litigation." Appellants' evidence fares no better. The evidence shows Appellants were not interested in pursuing the deal because

20

Midtown had not agreed Michaels would have control over product formulation. This deal was never consummated.

Again, we apply *Sargon's* two-part dichotomy. As a completely unestablished business, Blum had an uphill task of attempting to formulate a lost profit analysis. In discussing his analysis, Blum noted the lost profit calculation was based on other deals. Blum, however, offered no analysis on the identity or calculation analysis based on these other deals. Blum then offered a comparison to the ThinCare Agreement. This was lacking in any meaningful comparison between the two companies other than comparing the agreements and noting superficial similarity of products, time frames, and sales channels.

We agree with the trial court, this opinion was wholly speculative. The comparison between ThinCare and Midtown Equities is more problematic than the comparisons made in *Sargon*. Here, unlike *Sargon*, the Midtown's proposed business venture never got off the ground. Attempting to calculate lost profits of a business that was never created is a difficult proposition, one that takes much more than what Blum did in the instant case. The trial court was correct in excluding this opinion as speculative. On this, the trial court did not err.

### III.  DE NOVO REVIEW

Having determined the trial court abused its discretion in excluding Appellants' expert witness's opinion on the "Before and After Method" and on the calculation of lost profits on the "After" period from November 2011 to July 2013, we next independently review the evidence.

Respondents insist they are entitled to summary adjudication on three bases: (1) lack of evidence showing

21

causation and damages, (2) unclean hands, and (3) statute of limitations.

### A.   Causation/Damages

Respondents first contend they are entitled to summary adjudication because the record lacks sufficient evidence showing causation and damages.  We disagree.

### 1.   Legal Principles

Legal malpractice falls into two categories:  litigation, and, transactional.  In *Viner v. Sweet* (2003) 30 Cal.4th 1232 (*Viner*), the California Supreme Court held "just as in litigation malpractice actions, a plaintiff in a transactional malpractice action must show that *but for* the alleged malpractice, it is more likely than not that the plaintiff would have obtained a more favorable result."  (*Id*. at p. 1244.)  To prove causation in the "transactional" context, the *Viner* court explained "[t]he requirement that the plaintiff prove causation should not be confused with the method or means of doing so.  Phrases such as . . . 'no deal' scenario and 'better deal' scenario describe methods of proving causation, not the causation requirement itself or the test for determining whether causation has been established."  (*Id*. at p. 1240, fn. 4.)

While the terms "no deal" and "better deal" are helpful in analyzing the question of causation, they are not the actual test in determining causation.  Instead, "California has definitively adopted the substantial factor test of the Restatement Second of Torts for cause-in-fact determinations.  [Citation.]  Under that standard, a cause in fact is something that is a substantial factor in bringing about the injury.  [Citations.]  The substantial factor standard generally produces the same results as does the 'but for' rule of causation which states that a defendant's conduct is a

cause of the injury if the injury would not have occurred 'but for' that conduct. [Citations.] The substantial factor standard, however, has been embraced as a clearer rule of causation—one which subsumes the 'but for' test while reaching beyond it to satisfactorily address other situations, such as those involving independent or concurrent causes in fact. [Citations.]" (*Rutherford v. Owens-Illinois, Inc*. (1997) 16 Cal.4th 953, 968-969.) California Civil Jury Instructions (CACI) No. 430 sets forth the "Substantial Factor" test as follows: "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. [¶] [Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct.]" (CACI No. 430.)

"For the breach of an obligation not arising from contract, the measure of damages . . . is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." (Civ. Code, § 3333.) Thus, "an attorney's 'liability, as in other negligence cases, is for all damages directly and proximately caused by his negligence.' " (*Smith v. Lewis* (1975) 13 Cal.3d 349, 362, disapproved on other grounds in *In re Marriage of Brown* (1976) 15 Cal.3d 838.)

The amount of any damages suffered, however, is offset by any benefits the injured party may have received from the alleged wrongful conduct. (See *In re De Laveaga's Estate* (1958) 50 Cal.2d 480, 488-489; *Heckert v. MacDonald* (1989) 208 Cal.App.3d 832, 839.) This is referred to as the "Special Benefits" doctrine. (*Heckert*, *supra*, at p. 839.)

### 2. Analysis

The key question on causation is whether Markman's alleged legal malpractice was a substantial factor in causing harm to the Appellants. In business transactions, harm is necessarily reduced to damages. Both the Appellants and the Respondents have analyzed this question under the "better deal" and "no deal" methods discussed in *Viner*.

Appellants contend that, had Markman properly advised them on the 2009 *Biggest Loser* Agreement's restriction on external commercial activities, they could have pursued three better deals: (1) execute only the ThinCare Agreement, (2) negotiate the 2009 *Biggest Loser* Agreement with an exception for the ThinCare commercials, or (3) negotiate with ThinCare with the 2009 *Biggest Loser* Agreement restrictions included to form a different deal. Respondent contends no evidence supports any of these alternatives. We disagree.

Within Markman's deposition conducted on February 8, 2018 he indicated Michaels contemplated walking away from the Biggest Loser deal.

"[Question:] Okay. When was it expressed to you in the process what Jillian Michaels wanted in order to agree to go back to 'the Biggest Loser'?

"[Answer:] Well, when she said why she didn't want to go. When she said she didn't want to go back, she explained why.

"[Question:] Okay. And what was the reason why?

"[Answer:] Well, I think she felt she was being underpaid. I think she felt she was being paid less than her counterpart and that they were sort of abusing her time and her interaction with brands and things like that."

24

Michaels' declaration also supports this alternative. In it, she declared, "[h]ad Markman informed me, that the 2009 *Biggest Loser* Agreement would have rendered the representations and warranties in the ThinCare Agreement false, I may not have entered into the 2009 *Biggest Loser* Agreement. I felt the ThinCare Agreement was an incredible opportunity and worth a minimum of $5 million, while I had been having issues with the production of the *Biggest Loser*. Therefore, if I had been told I needed to choose one or the other I likely would have picked the ThinCare Agreement."

This supports the conclusion, had Markman advised the Appellants about the restriction on external commercial activities, Michaels could have chosen to execute only the ThinCare Agreement. While we recognize the ThinCare Litigation encompassed more than the question of false warranty in the agreement, our role is not to decide which side has the better case. When viewed in the light most favorable to the opposing party, the Appellants have met their burden of establishing a material factual dispute on causation.

Beyond causation, Appellants must also show they suffered a harm. On the issue of damages, we earlier determined the trial court abused its discretion in excluding a part of the Appellant's expert witness's opinion on lost profits for the "Before and After Method" of calculating lost profits, and, the "After" period from November 2011 to July 2013 which Blum calculated as $7,375,279. According to the Respondents, without the lost profits, Appellants retained a net benefit of $3,085,209. Applying the "Special Benefits" doctrine with the addition of the lost profits as claimed damages, the Appellants suffered a potential net loss

of $4,290,070.  As with causation, the Appellants have met their burden of establishing materiality on damages.[7]

## B.    Unclean Hands

Respondents alternatively contend Appellants are barred from recovery under the doctrine of unclean hands.  The trial court rejected this contention as do we.

### 1.    Legal Principles

"The doctrine [of unclean hands] demands that a plaintiff act fairly in the matter for which he seeks a remedy.  He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim.  [Citations.]  The defense is available in legal as well as equitable actions.  [Citations.]  Whether the doctrine of unclean hands applies is a question of fact." (*Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 978 (*Kendall-Jackson*).)

Furthermore, "[t]he unclean hands doctrine protects judicial integrity and promotes justice.  It protects judicial integrity because allowing a plaintiff with unclean hands to recover in an action creates doubts as to the justice provided by the judicial system.  Thus, precluding recovery to the unclean plaintiff protects the court's, rather than the opposing party's interests." (*Kendall-Jackson*, *supra*, 76 Cal.App.4th at p. 978.)

In *Blain v. Doctor's Co.* (1990) 222 Cal.App.3d 1048 (*Blain*), the court discussed a three-pronged test to determine whether the equitable defense of unclean hands bars a claim:  (1) analogous case law, (2) the nature of the misconduct, and (3) the

---

[7]    Since we have found Appellants have met their burden to show there are material disputed facts on causation under the "better deal" scenario, it is unnecessary to analyze the "no deal" scenario.

relationship of the misconduct to the claimed injuries. (*Id*. at p. 1060.)

###### 2. Analysis

Respondents claim, when Michaels executed the ThinCare Agreement, she personally signed an acknowledgment which stated: "By signing below, Jillian Michaels acknowledges that she has read this Agreement and confirms all grants, representations, warranties and agreements made by [Empowered] and agrees to make the contributions provided for therein in accordance with the terms and conditions thereof and if Jillian Michaels fails to do so, Jillian Michaels acknowledges that [ThinCare] shall have the same rights and remedies against Jillian Michaels as [ThinCare] has against [Empowered]."

Michaels, however, indicated in a declaration, despite having signed the acknowledgment to the contrary, she had not read the ThinCare Agreement before executing it. The ThinCare Agreement contained a warranty clause that provided Appellants have not entered into any other agreements that prevented the Appellants from performing any obligations in the ThinCare Agreement.

When ThinCare filed suit in 2011 against the appellants in federal district court in Utah, one of the causes of actions was for fraud in the inducement. ThinCare filed a partial summary judgment motion, like a summary adjudication motion in California, on the fraudulent inducement cause of action. On July 8, 2013, the district court conducted the hearing and provided a tentative to grant the motion in favor of ThinCare. The parties requested a two-day continuance to talk settlement which ultimately led to the Memorandum of Understanding.

27

The Appellant's second amended complaint contained a procedural history that discussed what occurred in the ThinCare Litigation.[8]  Respondents claim a sentence within the procedural history is an admission of fraud by the Appellants ("The Motion also set forth facts demonstrating that ThinCare had met all elements of its fraudulent inducement claim in its Complaint.").

This contention is resolved by looking at the second prong of the *Blain* test – nature of the misconduct.  In *Blain*, a medical doctor sued his attorney for legal malpractice because the attorney allegedly told the doctor to lie in a medical malpractice deposition.  The attorney defendant demurred on several theories including the doctrine of unclean hands.  The trial court sustained the demurrer without leave to amend. (*Blain*, *supra*, 222 Cal.App.3d at p. 1057.)

The doctor's misconduct was egregious.  It was "designed to disadvantage an injured patient in pursuing a claim for medical malpractice, resulting in severe and permanent injuries.  This is

---

[8]    Paragraph 63 of the Second Amended Complaint stated as follows:

"ThinCare's Motion for Partial Summary Judgment re Count IV (Fraudulent Inducement) of its Second Amended Complaint, filed April 8, 2013, set forth undisputed facts showing that the advertising-related exclusivity provisions of the earlier-signed BL4 Contract rendered false the Warranties made in the subsequently-signed ThinCare Agreement.  The Motion also set forth facts demonstrating that ThinCare had met all elements of its fraudulent inducement claim in its Complaint.  The Motion was fully briefed over the following weeks and, along with several motions filed by Ms. Michaels and Empowered Media, came before the court at a hearing held on July 8, 2013 (the "Hearing")."

an 'act involving dishonesty or corruption which is substantially related to the qualifications, functions, or duties of a physician and surgeon' within the meaning of Business and Professions Code section 2234, subdivision (e). Such an act is grounds for the professional discipline of a physician." (*Blain, supra,* 222 Cal.App.3d at p. 1064.) The *Blain* court upheld the trial judge's order.

On the nature of the alleged misconduct, our case is nowhere close. Respondents allege, by including the sentence in the second amended complaint as discussed above, Appellants have admitted the fraudulent inducement claim in the ThinCare litigation. Another paragraph within the same second amended complaint, however, sheds further light on this issue. In discussing the tentative ruling given by the Utah District Court, the second amended complaint states, "Greenberg Traurig and Markman's negligence, causing Ms. Michaels to unwittingly violate the warranties, directly led to this disastrous result." This potentially negates the requisite intent.

In denying Respondents summary adjudication motion on this ground, the trial court observed "that there is a triable question of fact as to the second element of unclean hands. Plaintiffs' admitted misconduct does not necessarily constitute unclean hands as a matter of law. . . . The language in the [second amended complaint] cited by Defendants instead constitutes an admission that Plaintiffs would have lost the fraud lawsuit against ThinCare – that is not the same as an admission that the facts underlying the lawsuit were true." We agree with this assessment and reach the same conclusion. Viewing these facts in the light most favorable to the Appellants, there exists a disputed material fact – the nature and extent of the alleged

29

misconduct – which must be resolved by a jury. As such, we need not analyze the other two prongs.

## C. Statute of Limitations

Respondents contend the causes of action related to the malpractice claims are barred by the one-year statute of limitations under Code of Civil Procedure section 340.6.[9] Respondents claim Appellants knew, or should have known, the alleged wrongful act or omission by no later than March of 2011 when they were served with the ThinCare complaint. Respondents further assert, the statute of limitations began to run when their litigation attorneys substituted out at the end of February 2012 making March of 2013 the time frame when the complaint on the malpractice claims had to have been filed. We disagree.

### 1. Legal Principles

"The continuous representation rule, as codified in section 340.6, subdivision (a), is not triggered by the mere existence of an attorney-client relationship. Instead, the statute's tolling language addresses a particular phase of such a relationship— representation regarding a specific subject matter. Moreover, the limitations period is not tolled when an attorney's subsequent

---

[9] Code of Civil Procedure section 340.6, subdivision (a) states in pertinent part:

"An action against an attorney for a wrongful act or omission, other than for actual fraud, arising in the performance of professional services shall be commenced within one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the facts constituting the wrongful act or omission, or four years from the date of the wrongful act or omission, whichever occurs first."

30

role is only tangentially related to the legal representation the attorney provided to the plaintiff.  [Citations.]  Therefore, '[t]he inquiry is not whether an attorney-client relationship still exists but when the representation of the specific matter terminated.' [Citation.]"  (*Foxborough v. Van Atta* (1994) 26 Cal.App.4th 217, 228-229.)

In *Crouse v. Brobeck, Phleger & Harrison* (1998) 67 Cal.App.4th 1509, the court discussed the contours involved in analyzing continuous representation.  The *Crouse* court explained, "[a] leading treatise . . . states that to qualify as the same subject matter '[t]he activities allegedly constituting continuous representation must relate to the main task or particular undertaking in which the error occurred. . . .  [¶]  . . . The focus should be on the objectives of the prior retention and whether the present activities fall within those objectives.' [Citation.]"  (*Id.* at p. 1530.)

When an attorney is formally substituted out as counsel, that usually terminates the attorney/client relationship. However, "the relationship can continue–notwithstanding the withdrawal and substitution–if the objective evidence shows that the attorney continues to provide legal advice or services. [Citation.]"  (*Shaoxing City Maolong Wuzhong Down Products, Ltd. v. Keehn & Associates, APC* (2015) 238 Cal.App.4th 1031, 1039.)  Acts such as (1) providing advice on the subject matter involving the alleged wrong act, (2) performing work, (3) billing for legal services relating to the on-going representation, (4) making appearances, (5) negotiating on the client's behalf, and (6) speaking or communicating on the subject matter of the representation – may be considered as objective evidence of an on-going representation.  (*Ibid.*)

### 2. Analysis

Appellants assert that Respondents continued to represent them on the ThinCare Litigation through Markman until Appellants formally severed ties on July 8, 2013. Until then, Appellants contend the Respondents continued to render legal services which tolled the statute of limitation under Code of Civil Procedure section 340.6, subdivision (a)(2) which provides for tolling when, "[t]he attorney continues to represent the plaintiff regarding the specific subject matter in which the alleged wrongful act or omission occurred." (Code Civ. Proc., § 340.6, subd. (a)(2).) According to the Appellants, with the execution of the tolling agreement, the statute of limitations was extended for an additional two years up until July of 2016 when the original complaint was filed.

A review of the record shows the following facts:

(1) When the ThinCare Litigation was filed in Utah, Markman recommended Appellants retain Greenberg Traurig litigation attorneys, Matthew S. Steinberg and Richard G. Merrill to represent the Appellants.

(2) Utah attorneys from the law firm of Strong & Hanni made a notice of entry of appearance of counsel in the ThinCare litigation on July 8, 2011.

(3) The Utah Federal District Court granted Greenberg Traurig's litigation attorneys, Matthew S. Steinberg and Richard G. Merrill, *pro hac vice* admission on July 12, 2011.

(4) Appellants discharged respondent Greenberg Traurig's litigation attorneys, Matthew S. Steinberg and Richard G. Merrill, reflected in a substitution of counsel filing which named Stuart Schultz of Strong & Hanni as counselor for the Appellants on February 29, 2012.

(5)     Appellants sent a letter dated August 22, 2013 to Markman which indicated Appellants had instructed Markman and Greenberg Traurig on July 8, 2013 to suspend all further services on their behalf.

(6)     Respondents and Appellants executed the Tolling Agreement effective July 8, 2014 for a one-year period.

(7)     Respondents and Appellants executed an Amendment to the Tolling Agreement effective July 8, 2015 for another one-year period.

(8)     Appellants filed the original complaint in the instant case on July 7, 2016.

On this issue, the factual question is whether between item (4) and item (5) above, Respondents continued to represent the Appellants on the specific subject matter in which the alleged wrongful act or omission occurred.

We note, this is not a case of litigation malpractice. Both sides agree, the *Viner* case is controlling because Markman provided transactional services as a shareholder partner for Greenberg Traurig. Furthermore, the record shows Respondents provided both transactional and litigation services which makes the analysis more complex than a garden variety litigation representation when counsel substitutes out.

Appellants' evidence shows they viewed Markman as "their legal counsel" and he continued to bill them for work performed until late 2013. For example, invoice number 3518158 for $59,964.08 shows entries for litigation related work on May 17, 2013, May 20, 2013, May 22, 2013, May 24, 2013, May 30, 2013, May 31, 2013, June 7, 2013, June 11, 2013, June 13, 2013, June 18, 2013, June 20, 2013, and June 21, 2013. While a transactional attorney can sometimes become involved in

33

litigation to render advice on deals they have worked on, and, while it is possible these billing entries were for work on behalf of the Appellants on some other litigation, we know for certain, this billing time period led up to the partial summary judgment motion hearing date in Utah District Court which occurred on July 7, 2013.

That Markman communicated and worked on the ThinCare Litigation after March of 2012 finds further support in the record. For example, on June 10, 2013, Strong & Hanni requested Markman's assistance on legal issues on the ThinCare Litigation memorialized in a letter sent by Strong & Hanni to the Appellants. This appears to correspond with Markman's billing notation from June 11, 2013. The record also contains an e-mail sent by Strong & Hanni to Appellants and Markman from May 29, 2013 on the potential impact of the federal court "unsealing" the case. The inquiry triggered Markman's involvement with litigation strategy on the potential impact of such "unsealing" on Appellants' federal regulatory concerns.

It remains an open question whether these actions by the Respondents were tangential to the prior representation or constitutes evidence of continuous representation. Resolving statute of limitations issue is normally a question of fact. (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 810.) Certainly here, the statute of limitations question involves materially disputed facts that cannot be resolved by a summary adjudication motion.

## DISPOSITION

The order granting the summary adjudication on the first, second, third, fifth and seventh causes of action is reversed. The case is remanded for further proceedings. Appellants are entitled to recover their costs on appeal.


OHTA, J.*

We concur:


BIGELOW, P. J.


GRIMES, J.

---

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.